**UNITED STATES of America**

v.

**Yu KIKUMURA, a/k/a "Masatoshi Kishizono".**

**Crim. No. 88–166.**

United States District Court, D. New Jersey.

Feb. 10, 1989.

Samuel A. Alito, U.S. Atty. and John P. Lacey, Asst. U.S. Atty., Newark, N.J., for the Government.

William M. Kuntsler and Ronald L. Kuby, New York City, for defendant.

## SENTENCING OPINION

LECHNER, District Judge.

*Introduction*

On April 12, 1988, Defendant Yu Kikumura ("Kikumura") was detained by New Jersey State Trooper Robert Cieplensky ("Trooper Cieplensky") for a motor vehicle violation. As a result of the ensuing exchange between Trooper Cieplensky and Kikumura, Trooper Cieplensky saw several cylinders of gunpowder and lead shot on the backseat of Kikumura's car. Trooper Cieplensky searched the interior of Kikumura's car and found three homemade bombs, along with the bag of lead shot and gunpowder cannisters.

Kikumura was indicted for unlawful possession (by an illegal alien) and transportation of explosives with intent to destroy property and harm individuals, unlawful possession of explosives which were unregistered and without serial numbers and violations of the passport and visa laws.

Following several months of adjournments because of previous engagements of counsel for Kikumura, this matter was scheduled for trial on November 28, 1988. At that time defense counsel made several motions in addition to other pretrial motions which had been previously decided. At the end of the hearing caused by the newly filed Kikumura motions, the attorneys for Kikumura, William M. Kuntsler and Ronald L. Kuby, proposed the Government and Kikumura enter into a stipulated set of facts and that Kikumura waive trial by a jury. November 28, 1988 Transcript ("Nov. 28 Tr. ___") at 155 to 161.

Mr. Kuntsler argued "there is no dispute [by Kikumura] as to what the proof will be [at trial]." Nov. 28 Tr. at 155. See also Nov. 28 Tr. at 156 to 161. Mr. Kuntsler further explained:

We would be willing to say that the defendant would stipulate—we would agree to a stipulated set of facts, that he had the devices [the bombs]. We wouldn't stipulate exactly where in the car, but he had the devices, they had no serial numbers, he had no permits, they were explosive devices and an expert brought in here would so testify, et cetera. Stipulate (sic) all of the moving facts that led to the indictment....

Nov. 28 Tr. at 156.

Mr. Kuby was more specific and forceful. He stated:

I mean, did he have the bombs? Well, yes, Judge, he had the bombs. Did they have serial numbers? No, they didn't have serial numbers, nor were they registered with the National Firearms Registration Bureau....

. . . . .

We're talking about stipulating to all of the material facts....

. . . . .

Let's waive the jury, we'll stipulate the facts before your Honor, the Government will presumably be forced to agree with the stipulations since it will be based on their indictment, and while I don't really care very much about saving the taxpayer's (sic) money,[1] it does in my view, save my client's dignity that we are not dragged through a proceeding which, while appearing to be very full and very fair, in reality is meaningless because of the particular facts of the case.

Nov. 28 Tr. at 158–59.

Mr. Kuntsler then concluded by stating:

All we want to do is preserve the appellate points and I think a stipulated agreement on facts before your Honor as the trial judge, without a jury, you will then find in favor of the [Government], *as you*

---

1. Mr. Kuntsler had previously suggested a bench trial based upon a set of stipulated facts would avoid subjecting "the taxpayers to a lengthy trial when there really is no dispute as to what the proof will be here." Nov. 28, 1988 Tr. at 155.

The extreme lateness of this suggestion did not save the significant expense incurred by the Government of transporting and lodging many witnesses from all over the United States and several foreign countries. In addition, this tactic did not avoid the expense of assembling a special jury panel of two hundred prospective jurors and having this panel available for two days before the trial on stipulated facts was effected.

*must* on the stipulated facts, and he will have his appeal.

28 Nov. Tr. at 160–161 (emphasis added).

The specific charges on which Kikumura was convicted were as follows: transportation and receipt of explosive materials in interstate commerce without having obtained a proper license or permit, in violation of 18 U.S.C. § 842(a)(3)(A) (Count 1); transportation and receipt and the attempted transportation and receipt of explosives in interstate commerce, with the knowledge and intent that those explosives would be used to damage real or personal property, in violation of 18 U.S.C. § 844(d) (Count 2);[2] possession of a firearm and ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5) (Count 3); the unlawful possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d) (Counts 4, 5 and 6); possession of firearms, each of which was not identified by a serial number, in violation of 26 U.S.C. ¶ 5861(i) (Counts 7, 8 and 9); use and attempted use of an altered passport, in violation of 18 U.S.C. § 1543 (Count 10); use and attempted use of a passport issued and designed for the use of another, in violation of 18 U.S.C. § 1544 (Count 11); and possession of a nonimmigrant visa which had been procured by fraud, in violation of 18 U.S.C. § 1546(a) (Count 12).

The statutory penalties to which Kikumura is now exposed total one hundred years in prison, fines of several million dollars plus a supervised release term of three years. In addition, pursuant to 18 U.S.C. § 3013, a special monetary assessment in the amount of $50.00 per count must be imposed.

Kikumura has been in custody since his arrest on April 12, 1988 and most likely will be deported by the United States Immigration and Naturalization Service upon completion of his term of imprisonment.

The Department of Probation has computed on a count-by-count basis an adjusted offense level and has made a multiple count adjustment for the charges for which Kikumura has been found guilty to arrive at a total offense level. Based upon a criminal history of one and a total offense level of eighteen, as computed by the Probation officer, the guideline imprisonment range pursuant to the Sentencing Commission Guidelines Manual (the "Guidelines Manual") and the Sentencing Reform Act, 18 U.S.C. § 3551 *et seq.*, (the "Act") is imprisonment for a total of from twenty-seven to thirty-three months for all twelve counts. A term of supervised release of not less than two and not more than three years on all counts is required. The fine range is from $6,000.00 to $60,000.00. The special monetary assessments total $600.00.

After considering all of the aspects of this case surrounding the finding of guilt on all twelve counts, including the aggravating factors concerning these offenses, and finding the Sentencing Commission did not adequately consider (and in fact did not consider) the kind or degree of the conduct at issue or the type or kind of individual who committed these offenses, it is, therefore, ADJUDGED, in Criminal Case 88–166 that the defendant, Yu Kikumura, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of thirty years, 360 months. This term consists of terms of ten years, 120 months on each of counts one and two, to run concurrently with each other, five years, 60 months, on count three to run consecutively to the sentence imposed on counts one and two, ten years, 120 months, on each of counts four through nine to run concurrently with each of counts four through nine but consecutively to the sentence imposed on count three, five years, 60 months, on each of counts ten through twelve to run concurrently with each of counts ten through twelve but consecutively to the sentence imposed on counts four through nine. A term of supervised release of three years and a special monetary

---

**2.** As was made clear at the time of trial, the Government specifically preserved its right to prove at the time of sentencing that Kikumura possessed those bombs with the intent to commit murder and not simply to damage property. November 29, 1988 Transcript ("Nov. 29 Tr. __") at 25–26.

assessment in the total amount of $600.00 are imposed. No fine will be imposed.[3]

There are four special conditions to this sentence of supervised release: (1) upon expiration of the period of confinement, Kikumura shall be delivered to the appropriate authority for deportation purposes; (2) Kikumura shall not commit any local, state or federal offense or crime; (3) Kikumura is to observe all conditions of supervised release; and (4) once deported, Kikumura is not to re-enter the United States, its territories or possessions unless previous written permission is obtained from the Attorney General of the United States or his authorized representative.

I have departed from the sentencing guidelines in this case pursuant to 18 U.S.C. § 3553(b). A sentencing court may impose a sentence outside the range established by the applicable guidelines if it is found that an aggravating or mitigating circumstance of a kind, or to a degree, exists which was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. *Id.* Fourteen criteria have been established by the Guidelines which are to be followed in departing from guideline sentencing. Guidelines Manual §§ 5K2.0—5K2.14. The circumstances warranting departure, by their very nature, cannot be exhaustively listed. Guidelines Manual § 5K2.0 at 5.36. As further noted in the Policy Statement concerning the grounds for a departure: "The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing." *Id.*

### A. Facts

The following are the facts, as I have found them,[4] after taking into considera-

tion the data presented at the suppression hearing, the trial facts, as stipulated by Kikumura, the testimony at the sentencing hearing and other reliable evidence offered at the sentencing hearing.

■ In summary, Kikumura is a member of the Japanese Red Army ("JRA"), a violent terrorist organization; he has trained other members of the JRA and received training from the JRA; he has engaged in a course of terrorist conduct in Holland concerning explosives which caused his arrest; he meticulously planned, schemed and attempted to execute a terrorist mission in this country with remarkable skill and deliberation; and he planned to kill and seriously injure scores of people. But for the alert and professional conduct of Trooper Cieplensky, Kikumura would have succeeded in murdering and maiming countless numbers of people—for no reason other than they are Americans.

### Kikumura's Background, Character and Conduct

As early as 1984, a confidential informant (the "informant") who supplied data to the Federal Bureau of Investigation (the "FBI"), was in the Bekaa Valley of Lebanon. It appears this informant, an admitted terrorist, was a member of a group whose past activities include terrorist bombings; he lived for some time in a camp maintained by that organization. While he was in the camp, in approximately 1984, three individuals, all of whom wore ski masks, arrived at the camp. The informant could see through the eyeholes of the ski masks and determined the individuals were Asians. The three individuals stayed in the camp one week and the informant

---

**3.** Based upon available financial data, it does not appear Kikumura is able to pay a fine even at the lower end of the guideline range. The significant term of imprisonment obviates the need of a fine as a deterrent in this case.

**4.** Section 6A1.3(b) of the Guidelines Manual states: "The court shall resolve disputed sentencing factors in accordance with Rule 32(a)(1), Fed.R.Crim.P. (effective Nov. 1, 1987), notify the parties of its tentative findings and provide a reasonable opportunity for the sub-

mission of oral or written objections before imposition of sentence." Counsel were notified twice of the opportunity to hear tentative findings concerning the sentencing hearing and of the further opportunity to respond if they so desired. On each occasion, counsel for Kikumura decided tentative findings were not necessary, waived the offer of tentative findings, and opted to go directly to sentencing. February 7, 1989 Transcript ("Feb. 7, 1989 Tr.") at 196–96 and 199.

observed these individuals working six hours per day in camp. The work he observed involved instruction on, among other things, different methods of combining chemicals to make explosives and detonators and the construction of improvised bombs. Toward the end of that week and on other occasions the informant saw each of these men with their masks removed. He knew them by their Arabic names, but all of them were Japanese. The informant was later advised by the leader of his own group that the one week training session was the beginning of a more cohesive relationship with the JRA.

In January, 1985, two of these JRA members returned to the camp for a four day follow-up training session. During instruction on "theory," the two did not wear masks. However, they again wore their masks when they spent two days practicing. The practice included the manufacture of explosives using, among other things, ammonium nitrate and aluminum powder. Indeed, the JRA trainees experimented with a variety of charges using certain percentages of each chemical. They also prepared mercury fulminate detonators for bombs and practiced using flash bulbs as detonators.[5]

In April 1985, three Japanese arrived at the camp. One of those individuals, who was referred to by the Arabic name "Yousif," was later identified by the informant as Junzo Okudaira, a JRA member. During their one-week stay, these individuals conducted research on remote control devices. Between April 1985 and May 1986, JRA members made short sporadic visits to the camp. Then, in May 1986, the informant was advised by the leader of his group that two men from the JRA would be coming to the camp. The purpose of their visit to the camp was to make arrangements for the JRA to move permanently into the camp.

At this time in May, 1986, Kikumura was arrested when he attempted to enter the Netherlands through Schiphol Airport in Amsterdam. Upon searching Kikumura's luggage, Netherlands authorities discovered a cardboard orange drink container filled with over two pounds of a high explosive. Also found in that luggage was a Sanyo radio containing six detonators of the type used to detonate explosives. The detonators were skillfully concealed inside the radio; they were extremely difficult to spot even on an x-ray photograph of the radio. In point of fact, a review of the x-ray of the radio taken by Dutch authorities demonstrates the placement and concealment of the detonators was so well done that they appeared to be integral parts of the radio. See Government Exhibit A-3. After Kikumura spent four months in prison in the Netherlands, the Dutch authorities decided not to continue their prosecution due to an illegality under Netherlands law. It appears prosecution was discontinued for technical reasons and not because Kikumura was innocent of the charges.

Between the spring and autumn of 1986, JRA members moved into the camp and built their own barracks for housing. Among the JRA members who moved into the camp were Junzo Okudaira. In the autumn of 1986 another JRA member arrived at the camp. This man, known to the informant by his Arab name, "Abu Shams," was identified as Kikumura.

The informant knew Kikumura as a "country boy" who spoke English more fluently than his colleagues.[6] Kikumura trained other JRA members in the use of rifles and handguns; it also appears he was a competent commando with knowledge of explosives. In addition, Kikumura once admitted to the informant that he had been to many countries and had previously

---

5. Significantly, mercury, flash bulbs, aluminum nitrate and aluminum powder were among the items which were recovered from Kikumura's car when he was arrested on April 12, 1988.

6. Significantly, Kikumura stated he did not need the aid of an interpreter in connection with the stipulated trial he proposed. He was more comfortable communicating in English. Nov. 29, 1988 Tr. at 7 and 14. At the time of sentencing, Kikumura addressed the court in English. Feb. 7, 1989 Tr. at 213–14.

been arrested in another country which he did not name.[7]

Another JRA member called "Mariam," who the informant identified as Fusako Shigenobu, was in charge of the JRA and maintained all of the high level contacts. Yousif (Okudaira) always remained at the JRA barrack and was in charge in Mariam's absence. The JRA had numerous daily and weekly meetings and appeared to rule by committee with Shigenobu occupying the most important position.

Mariam (Shigenobu) told the informant that the JRA's main enemy was the United States and that they wanted U.S. military bases out of Japan and opposed U.S. imperialism. Mariam told the informant that the JRA planned to strike within the United States. The informant also learned that in June, 1987, Mariam traveled to Libya after receiving an invitation to come there. The informant left the training camp in July, 1987 and did not return. At the time he left, Yousif (Okudaira), Kikumura and others remained at the camp.

*Conduct Concerning the Offenses at Issue*

Kikumura began his American mission while he was in Europe in or about February, 1988 where he obtained several visas for entry into several European countries and ultimately the United States. To facilitate both his international travel and his activities in America, Kikumura opened a bank account in Switzerland under an alias and obtained an otherwise valid Japanese passport which was altered to show his likeness in lieu of the person to whom it was originally issued.

Nothing has been presented to imply or suggest Kikumura, individually, had the ability or opportunity to obtain and skillfully alter a legitimate Japanese passport. The European leg of preparation for his activities in America, forms the basis to infer obvious organizational, technical and financial support given to Kikumura.

After entering the United States with the direct aid of the above-mentioned organizational, technical and financial support, Kikumura began his odyssey in this country which had the intermediate goal of the acquisition and assembly of the requisite elements for three powerful anti-personnel bombs. In order to effect the acquisition and manufacture of his anti-personnel bombs, Kikumura rented an apartment, purchased a 1980 Mazda automobile and traveled approximately 7000 miles to many out-of-the-way locations to purchase and assemble the components for his destructive devices.[8]

The travel conduct of Kikumura was undertaken with the intent and purpose to facilitate the undetected gathering of the elements for, and manufacture of, powerful anti-personnel bombs. A brief overview and partial summary of his itinerary within the United States will highlight Kikumura's intent, design and purpose.

On March 31, 1988, Kikumura purchased a container of epoxy, a can of contact cement, electrical tape and all-purpose wire at a K–Mart store in Lexington, Kentucky.

---

7. *See* discussion, *supra* at 336, concerning Kikumura's arrest at Schipol Airport in Amsterdam.

8. Kikumura's travels included the following:

| Date | Location |
| --- | --- |
| March 16, 1988 | Gloucester, Massachusetts |
| March 18, 1988 | New York, New York |
| March 22, 1988 | Mt. Olive, New Jersey |
| | Avon Lake, Ohio |
| March 23, 1988 | Dimondale, Michigan |
| March 24, 1988 | Chicago, Illinois |
| March 26, 1988 | Hannibal, Missouri |
| March 28, 1988 | Union City, Tennessee |
| March 29, 1988 | Murfreesboro, Tennessee |
| March 30, 1988 | Nashville, Tennessee* |
| | London, Kentucky* |
| March 31, 1988 | Lexington, Kentucky* |
| | Hurricane, West Virginia* |

| Date | Location |
| --- | --- |
| April 1–3, 1988 | Huntington, West Virginia* |
| April 4, 1988 | New York, New York |
| April 5, 1988 | Lancaster, Pennsylvania |
| April 6–7, 1988 | Huntington, West Virginia |
| April 8, 1988 | Weirton, West Virginia |
| April 9, 1988 | East Liverpool, Ohio* |
| April 10, 1988 | Cheltenham, Pennsylvania* |
| April 12, 1988 | Kikumura arrested in New Jersey |

* Receipts found in Kikumura's car indicate that Kikumura purchased bomb-making supplies at the listed location or at a location nearby. See Government Exhibit A10.

The tape and the wire were identical to that used by Kikumura to make his three bombs. Similarly, on April 1, 1988, Kikumura patronized Electronic Supply, Inc. in Huntington, West Virginia and purchased various wires, an on-off switch, electronic jacks and an electric circuit tester. A circuit tester, an instrument used to ensure that a wiring system is safe, can be used to test the safety of a fuzing system before connecting it to a bomb. The remaining items purchased by Kikumura, the wires, the switch and the jacks, were later used by him in making the electronic time-delay fuzing device.

On April 9, 1988, Kikumura purchased a hacksaw, carton sealing tape, a file and a vinyl suitcase. A laboratory analysis established Kikumura used the hacksaw to remove the tops of the fire extinguishers. This enabled Kikumura to use the modified fire extinguishers as bomb casings and fill them with gun powder and lead shot and to suspend a flash bulb from the top of each of the fabricated bomb casings into the center. The flashbulb was placed and wired to initiate the explosion of the gun powder in each bomb.

On April 10, 1988, Kikumura went to a Clover Department Store in Cheltenham, Pennsylvania where he purchased two packages of Sylvania flash bulbs, a package of "D" cell batteries and a carton of cigarettes. At the time of his arrest, all of these items were recovered from Kikumura's car, including a flash bulb from inside each of the three bombs. Each of those flash bulbs was connected to wires which were to be used by Kikumura to connect the bombs to the time-delay fuzing system.

On April 11, 1988, the day before he was arrested at the Vince Lombardie Service Area on the New Jersey Turnpike, Kikumura attempted unsuccessfully to sell his own car and to rent another car in Philadelphia. The person to whom Kikumura attempted to sell the car for $200.00 [9] was a former police officer who refused to accept the car without a proper title. In order to obtain a rental car, Kikumura offered the owner of a rental agency $500.00 and then $1,000.00 for the rental of a car. This effort was also unsuccessful.

Three other items recovered from Kikumura's car demonstrate the danger he presented: 2 cans of aluminum powder; ammonium nitrate; and mercury recovered from several thermometers. Aluminum powder [10] is often mixed by an experienced bomb technician with ammonium nitrate and other materials to create an extremely potent high explosive. In order to create an explosion from such materials, a detonator must be used. In this case, the mercury collected by Kikumura was well suited for creating what is known as a mercury fulminate detonator.[11]

### Anti–Personnel Bombs

There is only one conclusion to draw from the design and construction of the bombs. The bombs were intended and designed for flesh and blood, not bricks and mortar.

As noted, each of the three bombs manufactured by Kikumura was constructed from a fire extinguisher. In order to effect construction, Kikumura had to obtain the extinguishers and then remove their contents, thereby turning otherwise harmless fire extinguishers into bomb casings. He individually connected each of the three flash bulbs to electric wires by soldering each bulb to two wires and suspending a flash bulb from one end of the wires through the center of each of the bomb casings, leaving the other end of the wires on the outside of each casing for later

---

**9.** Kikumura purchased the car for $1,400.00 when he arrived in the United States and had it repaired on two occasions.

**10.** The aluminum powder was apparently purchased at a Nashville Tennessee Art Supply store and can be used to give paint a metallic finish.

**11.** Alternatively, the collection of the mercury may indicate the intended use as an anti-disturbance booby trap switch for the bombs. Accordingly, in addition to the bombs found in Kikumura's car, Kikumura also possessed materials which potentially could be used to manufacture a bomb to be detonated by a booby trap switch which would be activated when someone picked up the device.

connection to individual time-delay fuzing systems.

Kikumura poured more than three pounds of gun powder into each of the bomb casings, packed it with plastic and cardboard and then poured approximately three pounds of lead shot into each of the casings. As is stated in the June 15, 1988 FBI Report, this lead shot was clearly intended to produce "personal injuries." *Id.* Lead shot packed in this manner would result in the spraying of shrapnel in a wide pattern and cause indiscriminate death and horrible injuries. Significantly, lead shot has no utility in an explosive device intended for use in demolition or for causing damage to property—it simply wastes space which would be otherwise available in the casing for more explosives.

These facts leave no doubt that Kikumura knew precisely what bombs of this nature would do if detonated near people. In addition, Kikumura was able to purchase many otherwise innocuous items and use them to assemble, apparently without an instruction booklet, the complex time-delay fuzing system [12] which he intended to use to detonate the three anti-personnel bombs.

*Parallel Terrorist Conduct*

Kikumura's membership in the JRA and his association with Junzo Okudaira at the Bekaa Valley Camp shed light on the purpose of Kikumura's terrorist mission in the United States. The JRA/Bekaa Valley/Libyan connection to the conduct charged in the indictment traces its beginnings to April 14, 1986.

On April 5, 1986, a terrorist bomb exploded at a discotheque in West Berlin, killing an American soldier and injuring 50 other Americans. After obtaining strong evidence that Libya was behind the bombing, the Government effected an air attack on targets in Libya on April 14, 1986. It appears the JRA—and specifically Okudaira and Kikumura—carried out parallel retaliatory terrorist missions on the second anniversary of the U.S. air raid.

On April 14, 1988, a powerful car bomb exploded outside an American U.S.O. club in Naples, Italy, killing five people, including one U.S. serviceman, and wounding eighteen, four of whom were Americans. Based on fingerprint samples obtained by Italian authorities, Junzo Okudaira, the same man named by the informant as a colleague of Kikumura, is the prime suspect in that case.

From the facts available and the inferences drawn from such facts, it appears Kikumura's mission in the United States was to carry out a parallel attack on American soil. Evidence strongly suggests Kikumura was planning to detonate his bombs at approximately the same time as the deadly April 14, 1988 Naples bombing. At the time of Kikumura's arrest on the morning of April 12, 1988, he was headed back to New York City after a trip that had taken him as far west as Missouri, Illinois, Tennessee and Kentucky. As late as April 9 and 10, he was still purchasing bomb-making paraphernalia, and on April 11, in Philadelphia, he tried to sell his car and obtain a rental car. At the time of his arrest, the bombs were fully assembled and ready to be detonated and Kikumura had in his possession an airline schedule bearing the handwritten notation "Friday morning, 330.00, 4/15." All of this clearly suggests that Kikumura planned to detonate the bombs and depart by plane by April 15.[13]

In addition to the relationship between Kikumura and Okudaira, and the similar timing of the two incidents, the two cases have many other similarities.

| | Naples | United States |
|---|---|---|
| 1. | JRA member (Junzo Okudaira) | JRA member (Yu Kikumura) |
| 2. | Present in Italy | Present in United States |
| 3. | Used photo altered Japanese passport | Used photo altered Japanese passport |

12. A description of one of the assembled fuzing systems and the other items needed to assemble two more fuzing systems is set forth in the June 15, 1988 FBI Report, D–1 at 16–18.

13. Kikumura argues that because there were no international flights available on April 15, 1988 for $330.00, the inference of departure to a foreign county is inappropriate. In the circumstances of this case, I regard the marking of a date on an airline schedule probative of an intent to depart, especially in light of Kikumura's motive to flee.

| | Naples | United States |
|---|---|---|
| 4. | Rental car was used for car bomb | Kikumura unsuccessfully attempted to rent a car, even up to the day before his arrest |
| 5. | Always paid cash using local currency | Always paid cash using local currency |
| 6. | Used explosive with timing devices | Had explosive with time devices |
| 7. | Added shrapnel to his explosives | Added shrapnel to his explosives |
| 8. | Occurred April 14, 1988 | Arrested April 12, 1988 with explosive ready for use; Notation on airline schedule for "Friday morning, 330.00, 4/15." |
| 9. | Targeted a "soft" U.S. Military facility | Possessed a Map with mark indicating area where Naval recruitment office is located in New York City |
| 10. | Used high explosives | Possessed high explosive mixture containing ammonium nitrate and aluminum powder |

Based on all of the above facts, there is no conclusion other than Kikumura is an international terrorist, who has trained members of and has been given training by the JRA, who quietly acquired the elements for and constructed three anti-personnel bombs with the intent of murdering scores and severely wounding scores more of the survivors of the blast in order to wage war on the enemy of the JRA [14]—the United States.

**B. Discussion**

■ A defendant's intent and potential to cause death and serious injury are significant factors that must be considered in sentencing under the Act. The Act itself provides a sentencing court "shall consider —the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. Section 3553(a)(1). In addition, a court "shall consider

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2)(A) to (D). Likewise, the Sentencing Guidelines specifically list "death," "physical injury," "the dangerousness of the instrumentality (weapon)," "disruption of governmental function" and "extreme conduct" as factors warranting departure. Sections 5K2.1, 5K2.2., 5K2.6, 5K2.7 and 5K2.8.

In this case, none of the applicable guidelines takes these critical factors into account. In point of fact, the Guidelines do not consider terrorism or conduct remotely similar to that of Kikumura. Here, because Kikumura intended to cause death and horrible injury, a departure from the guidelines is warranted. Moreover, because the defendant's bombs were intended to cause multiple deaths and injuries, as did the Naples bomb, greater departure is warranted. The dangerousness of the bombs, disruption of governmental function and extreme conduct are obvious.[15]

■ A departure from the guidelines may be necessary if an important factor, while taken into account to some degree in the guidelines, is not "adequately" taken into account. 18 U.S.C. Section 3553(b); See Guidelines § 5K2.0. In the present case, the guidelines take into account the defendant's possession and transportation of "explosives" or "weapons" (Sections 2K1.3, 2K1.6, 2K2.1, 2K2.2), but not the nature or actual intent of Kikumura concerning those explosives.

Kikumura possessed three powerful anti-personnel bombs. The bombs contained ten pounds of gunpowder, the explosive force of which alone was capable of caus-

---

**14.** Although I am satisfied Kikumura is a member of the JRA, such a finding is not crucial to the determination of the sentence imposed. Even if he did all of this without any JRA affiliation, I would still have imposed the same sentence for his crimes in this country.

**15.** This case presents multiple reasons to depart from the guidelines and any one reason is more than adequate justification for departure and the sentence imposed.

ing significant injury or death and property damage. Kikumura greatly multiplied the potential of the bombs by adding a large quantity of lead shot, which was intended to serve as shrapnel. This shrapnel would have been of no use if Kikumura had intended merely to damage property; however, for anyone near the explosion it would have had the same affect as an immense shotgun blast or the detonation of a Claymore mine.[16]

■ The "manner" in which Kikumura intended to use the bombs also supports an upward departure. Because Kikumura constructed one time-delay fuzing device (and possessed the components for others), it is obvious he intended to detonate the bombs after he had left the scene. Consequently, if Kikumura had planted the bombs in a public place, as was done in Naples, he would have had no idea (and obviously did not care) whom he would kill or injure. This intent and design to effect indiscriminate murder and mayhem must result in a severe sentence.

The guidelines specifically recognize that a court may impose a sentence above the guideline range based upon "extreme conduct," including the "gratuitous infliction of injury." Section 5K2.8. Here, the defendant's plot to kill and maim whomever happened to be near his bombs at the time of detonation was unusually heinous and brutal; it clearly constitutes "extreme conduct." [17]

■ Under the sentencing guidelines, only convictions of a defendant are normally considered in determining the applicable criminal history category. Here, however, a departure is warranted because "the criminal history category significantly under-represents the seriousness of the defendant's criminal history [and] the likelihood that the defendant will commit further crimes." Sentencing Guidelines Manual, Policy Statement of § 4A1.3 at 4.9. See also 18 U.S.C. Section 3553(a)(1) and (a)(2)(C). In this case, both the conduct [18] resulting in Kikumura's 1986 arrest in the Netherlands for terrorist activities and his terrorist training in Lebanon [19] are aspects of his criminal history which must be considered and which justify departure from the guidelines.

■ Section 5K2.14 of the Guidelines states:

If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

*Id.* Kikumura's terrorist plot presented a grave threat to public health and safety. Had he succeeded in detonating his bombs in a crowd, a large number of innocent persons would have been killed and seriously injured.

■ As an agent of international terrorism, Kikumura also constituted a threat to national security. It appears Kikumura's mission was to retaliate for United States military action against another nation. His objective was to strike, not at any person or private group, but at the United States as a nation. It further appears his objective, and that of the JRA, was to inflict

---

16. A Claymore mine is a military anti-personnel weapon designed to kill and disable through the use of a large quantity of shrapnel propelled by an explosive charge—the type of device Kikumura assembled.

17. Kikumura's manufacture of the bombs is an important component of "the nature and circumstances of the offense" to be weighed in imposing sentence. 18 U.S.C. Section 3553(a). Kikumura went to great lengths to purchase the tools and components needed to construct the anti-personnel bombs. He then made the bombs himself. In addition, there is evidence he may have intended to enhance the explosive force by making an even more powerful type of explosive using ammonium nitrate and aluminum powder, both of which were found in his car.

18. It is stressed that consideration has been given to the conduct surrounding his arrest in Amsterdam, *not* the arrest itself. "A sentencing court has also been allowed to take into account the 'highly relevant' information that a defendant has been involved in prior criminal activities, even though he has never been prosecuted or convicted for those activities." *United States v. Silverman,* 692 F.Supp. 788, 790 (S.D.Ohio 1988) (citation omitted).

19. See comment in footnote 14 concerning the JRA and its impact on this sentence.

revenge upon this country and if possible to deter the United States Government from any similar military action in the future against terrorists and their supporters and principals.

▉ The Guidelines Manual recognizes that the disruption of governmental functions may justify a departure from the guidelines. See Guidelines Manual § 5K2.7. In this case, the retaliatory bombings plotted by the JRA were unmistakably intended to alter through illegal means American anti-terrorist policy. By slaughtering innocent Americans both here and abroad on the second anniversary of the Libya bombing, Kikumura and his terrorist co-conspirators sought to prevent the United States government from carrying out any future anti-terrorist strikes for fear of similar deadly reprisals. This effort to subvert the lawful government decision-making processes justifies a departure from the guidelines.

In anticipation of a departure from the Guidelines, Kikumura submitted a Sentencing Memorandum to confront this issue head on and address the issues he perceives as relevant to his sentencing. Kimkumura argues he should be given a hearing and the Government should be forced to prove its allegations concerning his intent and that he is a terrorist. Kikumura is correct on both points. A sentencing hearing took place and the Government was put to its proofs. Significantly, however, Kikumura did not avail himself of the opportunity to "produce evidence, including his own testimony, to refute" the reliable data offered by the Government. *United States v. Cifuentes*, 863 F.2d 1149, 1155 (3d Cir.1988). *See also, Silverman*, 692 F.Supp. at 790–91.

Kikumura argues the Government should not be permitted to prove its allegations concerning him and his JRA affiliation by any evidence other than testimony from its confidential informant.[20] Kikumu-

ra argues that to do otherwise would be for this court to "embrace a form of totalitarianism that violates every basic principle of due process in a democratic society." Kikumura Sentencing Memorandum at 2.

This arrogant hyperbole is wrong and misses the point, for as the Kikumura Sentencing Memorandum itself notes:

> While the case law reflects a belief that a sentencing judge must have access to a broad range of information, it also insists that such information be reliable.... Indeed, the Supreme Court ... only sanctioned the use of *"responsible unsworn of (sic) 'out-of-court' information." United States v. Baylin*, 696 F.2d 1030, 1039 (3d Cir.1982) (emphasis in original).

*Id.* at 5. Although not noted in Kikumura's Sentencing Memorandum, 18 U.S.C. § 3661 states:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

*Id.* Moreover, "[h]earsay information may unquestionably be used in the discretion of the sentencing judge and given such weight as appears in his discretion to be merited." *Napolitano*, 761 F.2d at 139.

In *Baylin*, the Third Circuit held that as a matter of due process the data offered in a sentencing hearing need only have "some minimal indicium of reliability beyond mere allegation." *Id.*, 696 F.2d at 1040. The Circuit stated: "[S]uch information must, either alone or in the context of other available information, bear some rational relationship to the decision to impose a particular sentence." *Id.* In determining a disputed factor at sentencing, "the court may consider relevant information without regard to its admissibility under the rules of

---

**20.** I am satisfied not only that the Government has a legitimate reason to protect confidentiality of informants in cases of this kind but also that "[t]he public interest at stake in effective law enforcement is ample justification to the privilege." *United States v. Napolitano*, 761 F.2d 135, 139 (2d Cir.), *cert. denied*, 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). Moreover, because of the nature of the information provided, there is more than ample evidence to conclude the life of the informant would be at risk if he were produced.

evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." Guidelines Manual § 6A1.3(a). *Accord,* Fed.R.Evid. 1101(d)(3); *Silverman,* 692 F.Supp. at 790. Indeed, Kikumura concedes "hearsay is not *per se* inadmissible in a sentencing hearing, just as hearsay is not *per se* unreliable." Kikumura Sentencing Memorandum at 6.

 The evidence offered by the Government through the affidavits of Michael R. Hartman, Special Agent of the FBI, and Jacob Van Mastright, a Sergeant–Major with the Netherlands National Police, contain in themselves and in conjunction with other evidence more than sufficient indicia of reliability to support their probable accuracy. Guidelines Manual § 6A1.3(a); *Napolitano, supra.* In addition, there is a question as to whether "any factor important to the sentencing determination is reasonably in dispute." *Id.* Other than a series of objections to the Presentence Investigation Report ("PSI"),[21] which at the sentencing hearing Mr. Kuby advised should be read as denials, Kikumura has offered nothing to counter the facts offered to prove his terrorist affiliations.[22] With regard to the proffered affidavits, Kikumura objected only to the Hartman affidavits.

The totality of the evidence submitted in this case which consists of the affidavits of Hartman, Van Mastright and the Government's written statements of counsel, the Government sentencing memorandum, together with other independent proof such as the testimony of case agent Joseph R. Fuentes and James T. Thurman, a bomb expert, and the stipulated facts for the bench trial constitute a body of appropriate reliable proof.

The independent proof offered in this case corroborates the hearsay. For example,[23] the detailed written statements of Government counsel concerning the procurement and use of a foreign passport and visas are corrobrorated by the stipulated facts upon which Kikumura's convictions are based. The anti-personnel nature of the bombs, as submitted in the Government Sentencing Memorandum, is supported by the testimony of Joseph T. Thurman, a bomb expert, and the components of the actual bombs themselves. The terrorist affiliations of Kikumura, as argued in the written statements of Government counsel and the Hartman and Van Mastright affidavits, are supported by the stipulated facts which forcefully infer Kikumura had organizational, technical and financial support to transit Europe and effect entry into this country and had training as to the

---

**21.** I accept the government's version of Kikumura's offenses and find such version is consistent with the evidence introduced at the suppression and sentencing hearings as well as at the bench trial.

I have reviewed in detail the objections submitted by Mr. Kuby with regard to the PSI. Other than the objection to paragraph 24 which correctly notes a detonator was not then found on Kikumura, all objections are rejected. The report will be corrected to show this change. Findings with regard to the stop, search and arrest of Kikumura are more particularly set forth in *United States v. Kikumura,* 698 F.Supp. 546 (D.N.J.1988). The balance of the objections are addressed by the findings of fact in this opinion. If there is any conflict with the PSI, this opinion shall control.

**22.** As the commentary to § 6A1.3 notes: "Written statements of counsel or affidavits of witnesses may be adequate under many circumstances." *Id.* The objections submitted on behalf of Kikumura by Mr. Kuby, dated January

24, 1989, are conclusory and offer no data to support the various denials. The Kikumura Sentencing Memorandum does not offer any data but argues the law concerning several legal issues.

These submissions on behalf of Kikumura cannot be read as "written statements of counsel" (see Commentary, § 6A1.3) which provide data to establish a reasonable dispute other than a mere denial. These written statements of counsel for Kikumura do not compare with the Government's Sentencing Memorandum which does in fact provide data which are adequate under the circumstances. In addition to the summary of the Hartman and Van Mastright affidavits, the Government Sentencing Memorandum provides data about the Naples bombing, the FBI reports and Kikumura's travels which data are adequate under the circumstances.

**23.** The examples of reliability beyond mere allegation are just that—examples. No attempt is made to chronicle each supporting and corroborating fact.

construction of anti-personnel bombs.[24] In addition, Kikumura has not objected to paragraph 158 of the PSI which states: "Government investigators state that the defendant entered college but quit and was a member of several left wing groups."[25] PSI, ¶ 158. This uncontested fact corroborates, to an extent, the statements in the Hartman affidavits by demonstrating Kikumura's background in left wing organizations. This is another fact which adds to the reliability and credibility of the data in the Hartman affidavits.

In addition, much of the information in the Hartman affidavits has been confirmed by the Japanese law enforcement authorities (with regard to the time the informant said Kikumura was traveling). The fact that he arrived in the Bekaa Valley training camp in the Fall of 1986, Hartman Affidavit at ¶ 11, is consistent with his release by Dutch authorities in late August, 1986. Kikumura's possession of aluminum powder and ammonium nitrate at the time of his arrest and their use to make a high explosive, as described by Mr. Thurman at the hearing, support the informant's assertion of the JRA Bekaa Valley training with these items. *Id.* at ¶ 8. The statement of a JRA planned strike in the United States is supported by the very facts and circumstances of this case and its similarity to the Naples bombing.

The informant's statement that Kikumura is a country boy, *id.* at ¶ 12, is supported by the letters describing Kikumura sent to the court by his family. The statement that Kikumura is relatively fluent in English, *id.*, is supported by Kikumura's travels around the United States and his conduct and statements at trial and at the sentencing hearing where he indicated he did not need the assistance of an interpreter.

The statement of the informant that Kikumura "was a competent commando who had knowledge about explosives," *id.*, is supported by his activities in this country and the very manufacture and sophistication of the bombs. The statements the informant attributed to Kikumura about an arrest in another country, *id.*, are corroborated by the Dutch arrest.

The informant's statements, as related in the Hartman affidavits, are strongly corroborated by all of Kikumura's activities in this country. The parallels of Kikumura's activities in this country with the training in the Bekaa Valley are more than coincidence, especially when all of the facts are taken into consideration. Although Kikumura did not have a fifty pound bag of agricultural-grade[26] ammonium nitrate when arrested, he did have a small amount of the substance. The logical inference is that Kikumura once had a larger amount of ammonium nitrate. Significantly, ammonium nitrate and aluminum powder were items used in Bekaa Valley training for bomb production.

Considering the foot prints left by this evidence, especially as described by Mr. Thurman, the conclusions drawn are amply supported. Kikumura had all the ingredients to make high explosives and in fact he assembled sophisticated anti-personnel bombs and an advanced fuzing device. The same training was available to JRA members at the Bekaa Valley. He had no instruction manuals to accomplish the manufacture of the bombs—this knowledge had to be learned some place. The evidence leads to the conclusion that the statements of the informant contained in the Hartman affidavits are very reliable. The statements are not mere allegations; they have substance and credibility.

At the sentencing hearing Kikumura challenged the Government's use of the

---

24. Nothing has been submitted to infer Kikumura received legitimate academic training which he could have applied to the manufacture of bombs.

25. Because this statement was neither denied nor objected to, it is accepted as fact and used as such.

26. This is the grade of ammonium nitrate in his possession at the time of arrest. Mr. Thurman stated agriculture grade ammonium nitrate is sold in fifty pound bags.

hearsay statements of the informant contained in the Hartman affidavits. However, Kikumura failed to adduce any evidence that the information contained in these affidavits, or for that matter any other evidence offered by the Government, was false.[27] To the contrary, Kikumura declined to testify or offer any evidence to bring into question the credibility or accuracy of the Government's evidence.

Based upon the nature of the acts committed and for which Kikumura was found guilty, the data in the PSI, the testimony at the hearing, together with the affidavits and written statements of Government counsel, a body of appropriate proof emerges, the sum of which is greater than its constituent parts. *See United States v. Cifuentes, supra,* at 1155; *Silverman,* 692 F.Supp. at 790.

■ Kikumura argues the Government should be held to a standard of proof higher than a preponderance of the evidence. Kikumura argues the Government must prove its allegations by clear and convincing evidence. Kikumura Sentencing Memorandum at 5. However, the defense did not address the directives of § 6A1.3 with regard to the resolution of disputed facts. The Commission indicated in § 6A1.3 that in resolving a reasonable dispute, the court may consider relevant information without regard to its admissibility under the rules of evidence "provided that the information has sufficient indicia of reliability to support its *probable accuracy." Id.* (emphasis added). The term "probable accuracy" does not suggest a clear and convincing standard. Probable accuracy can be read to mean more likely than not—a preponderance standard. The reasoning in *United States v. Lee,* 818 F.2d 1052 (2d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987), a pre-guidelines case, establishing a preponderance of the evidence standard at a sentencing hearing, is

equally applicable to a guidelines case. *See also Silverman,* 692 F.Supp. at 788; *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). Accordingly, the preponderance of the evidence standard has been applied in making the findings of fact in this case.[28]

Kikumura argues no departure from the guidelines is warranted because, among other things:

1) No one actually suffered death or serious injury. Kikumura Sentencing Memorandum at 11.

2) The bombs were not planted or detonated. *Id.*

3) "A single stick of dynamite, properly placed, can cause enormous damage. The very nature of explosives is to cause damage.... Absent some showing that these devices were so far outside the realm of 'average bombs' that Congress did not conceive of the situation when it enacted the relevant laws, no departure is warranted." *Id.* at 12.

4) "There are few 'bomb stores' in this country where one can purchase a ready-made explosive device. Virtually everyone who is charged with possession of explosives assembled the bombs themselves." *Id.* at 14.

5) Kikumura did not engage in extreme conduct. *Id.*

6) "Simply stated, possession of the explosives did not endanger the public." *Id.* at 15.

7) "[T]here is something fundamentally unfair and repugnant in sentencing a defendant for what he did not do." *Id.*

These additional examples of arrogant hyperbole offered in mitigation of conduct so evil in nature and depraved in character cause but a momentary pause to reject them out of hand.

■ The facts that no one died or was maimed, that the bombs were neither

---

**27.** During the cross examination of Mr. Fuentes, Kikumura did, however, effectively question the reliability of an identification of him by two witnesses at or near a Government building in New York City.

**28.** I note, however, the evidence is sufficient to make these findings under a clear and convincing standard. The evidence is strong, credible and reliable; it is persuasive. Accordingly, even if a clear and convincing standard were deemed to be appropriate, the same findings would result.

placed nor detonated and that explosives by their nature cause damage do not mean Kikumura did not engage in extreme conduct. But for the professionalism of Trooper Cieplensky, Kikumura would have randomly selected innocent people as victims of his diabolical scheme of indiscriminate death and suffering. His very presence is a danger to society. There is nothing fundamentally unfair or repugnant in sentencing Kikumura for a scheme which he was fortunately prevented from completing.

It is clear, pursuant to 18 U.S.C. § 3553(b) that a sentencing judge does not have merely the option but rather the duty to impose an appropriate sentence having due regard for the four purposes set forth in 18 U.S.C. § 3553(a)(2)(A)–(D). In determining the appropriate sentence, proper consideration must be given not only "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," *id.* at (a)(2)(A), but as well "to afford adequate deterrence to criminal conduct" and in this case, most importantly, "to protect the public from further crimes of the defendant." *Id.* at (a)(2)(B) and (C).

The need for self defense, to protect the public from additional crimes by the defendant, is compelling. Kikumura is dangerous. It is not only probable, it borders on certainty, that he will commit similar offenses in the future given the opportunity to do so. These offenses could not provide a more clear example of the need for specific deterrence with regard to an individual.

With regard to the concept of deterrence, sentencing should parse out the differences between general deterrence and specific deterrence. Obviously, general deterrence seeks to discourage similar and parallel wrongdoing by others through a swift and sure statement of the real and serious consequences of significant imprisonment which is certain to follow such abhorrent conduct. Specific deterrence on the other hand is directed to the culpable individual.

These comments are not meant to suggest the imposition of a personal sentenc-

ing philosophy to the displacement of the reasoning of Congress as codified in the Act. Indeed, the Act, by its very terms, embraces these concepts. Section 3553(a)(2)(B) speaks about affording adequate deterrence to criminal conduct; it addresses the concept of general deterrence. Section 3553(a)(2)(C) looks to protect the public from further crimes of the defendant, obviously, specific deterrence with regard to the individual in question.

To permit Kikumura to mingle among the citizens of this or any other society before lengthy debilitation in the most secure prison facility is to invite not only him, but indeed others, to effect mind numbing calamity. In review of the mandate of 18 U.S.C. § 3553(a) and (b), a reasonable sentence, not greater than necessary to comply with the purposes as set forth above, must be no less than thirty years.