**Yu KIKUMURA, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civil Action No. 96–3781(AJL).**

United States District Court, D. New Jersey.

Aug. 28, 1997.

Glenn A. Garber, Garber & Rodi, P.C., New York City, for Petitioner.

Faith Hochberg, U.S. Attorney, Kevin McNulty, Assistant U.S. Attorney, Newark, NJ, for U.S.

## OPINION

. LECHNER, District Judge.

■ Petitioner Yu Kikumura ("Kikumura"), presently incarcerated at A.D.X. Florence, a Federal Penitentiary in Florence, Colorado, brings this petition for a writ of habeas corpus (the "Habeas Petition") pursu-

ant to 28 U.S.C. § 2255.[1] For reasons set forth below, the Habeas Petition is denied. There is no probable cause for appeal.

*Facts*

A. *Arrest and Indictment*

On 12 August 1988, Kikumura was detained by New Jersey State Trooper, Robert Cieplensky ("Cieplensky"), for careless driving. *United States v. Kikumura*, 698 F.Supp. 546 (D.N.J.1988) (*"Kikumura I "*). Following an exchange between Cieplensky and Kikumura, Cieplensky identified seven cylinders of gunpowder and shot on the backseat of the vehicle driven by Kikumura (the "Kikumura Vehicle"). *Id.* Cieplensky proceeded to conduct a pat down search of Kikumura and an interior search of the Kikumura Vehicle. The search led to the discovery of a large bag of lead shot, seven gunpowder canisters and three homemade bombs, as well as altered passport and visa documents, in the Kikumura Vehicle. *Id.* Kikumura was subsequently arrested. The grand jury returned a twelve count indictment ("Indictment") against Kikumura, charging him with, among other charges, the possession of explosives with the intent to damage property

---

1. In support of the Habeas Petition, Kikumura submitted: Brief in Support of Motion for Sentence Reduction and Record Expansion Pursuant to 28 U.S.C. § 2255 ("Moving Brief"); Attorney's Certification and Exhibits in Support of Motion to Reduce Sentence or to Expand the Record Pursuant to 28 U.S.C. § 2255 ("Garber Cert."), with Exhibits 1 through 12 attached; Reply Brief ("Reply Brief").

 In opposition to the Habeas Petition, the United States (the "Government") submitted: Answer to Motion to Correct Sentence Pursuant to 28 U.S.C. § 2255 dated June 13, 1997, and Supplemental Papers ("Opposition Brief").

 On or about 11 July 1997, Kikumura filed a notice of motion seeking, among other things, to supplement the Moving Brief ("11 July 1997 Motion"). The 11 July 1997 Motion was denied on 16 July 1997.

 In the Reply Brief, Kikumura requests that the Opposition Brief be rejected because it is in violation of the page limit requirements set out in orders, dated 1 April 1997 ("1 April 1997 Order") and 2 April 1997 ("2 April 1997 Order"). *See* 1 April 1997 Order (giving Government forty-five pages to answer Moving Brief); 2 April 1997

 Order (giving Government ten additional pages to address supplemental issue). As well, Kikumura argues: "[T]he [G]overnment reduced the type face of the text to accommodate [fourteen] characters per inch, as opposed to the standard [ten] characters per inch." Reply Brief at 1.

 The Opposition Brief will not be rejected. The Opposition Brief was fifty pages. The briefing of the issue raised *sua sponte* began on page 48, three pages in excess of the original limitation. From page 42 through page 47, the Government attempted to address additional issues raised by Kikumura in the 11 July 1997 Motion.

 The type face of the Opposition Brief was not difficult to read. It does not appear the Government intended to alter the type to make a lengthier brief fit into the page limitations imposed. Several pages of the Opposition Brief, *see* Opposition Brief at 6, 15, 30, 34, 37, 47, had large gaps of blank space before beginning the next section on the following page. If the Government were to resubmit their brief using courier font, twelve-point type, and omitting the blank spaces, the Opposition Brief would be within the page limitations imposed.

or harm people, pursuant to 18 U.S.C. § 844(d) ("Section 844(d)"). *See* Indictment.[2]

### B. *Motion to Suppress*

Kikumura filed a motion to suppress ("Motion to Suppress"), challenging the legality of the pat down search and search of the Kikumura Vehicle. *Kikumura I,* 698 F.Supp. at 555. A suppression hearing was conducted on 30 September 1988. *See* Transcript of Proceedings, dated 30 September 1988. The detention, pat-down search and search of the vehicle were found to be constitutional. *Kikumura I,* 698 F.Supp. at 562. The Motion to Suppress was denied, *id.;* the decision was affirmed on appeal. *Kikumura III,* 918 F.2d at 1090, 1093.

### C. *Trial on Stipulated Facts*

The matter was scheduled for trial on 28 November 1988. At that time, counsel for Kikumura, William M. Kuntsler ("Kuntsler") and Ronald L. Kuby ("Kuby") (collectively, "Trial Counsel"), proposed the Government and Kikumura enter into a stipulated set of facts, while preserving the issues for appeal, and Kikumura waive a trial by a jury. *United States v. Kikumura,* 706 F.Supp. 331, 333 (D.N.J.1989) (*"Kikumura II"*) (citing Transcript of Proceedings, dated 28 November 1995 ("28 November 1995 Tr."), 155–161).

Kikumura stipulated he transported the explosives with the knowledge and intent that they be used to damage or destroy property. *United States v. Kikumura,* 947 F.2d 72, 74 (3d Cir.1991) (*"Kikumura IV"*). Kikumura refused to stipulate to the statutory language that he transported the explosives for their use to "kill, injure and intimidate one or more individuals." *Id.* The Government made clear it was "stipulating to the facts for purposes of the trial, the adjudication of guilty or innocence," and that it was not stipulating to facts under the Sentencing Reform Act for the purposes of

sentencing. *See* Transcript of Proceedings, dated 29 November 1988 ("29 November 1988 Tr."), 6; *see also id.* at 25–26. Kikumura agreed the "stipulation [did not] bar [the Government] from doing anything they would ordinarily be permitted to do at sentencing." *Id.* at 26.

"Kikumura was convicted of numerous counts of interstate transportation of explosive devices and passport offenses, including a charge that he violated [Section 844(d) ] which prohibits the transportation of any explosive in interstate commerce 'with the knowledge or intent that it will be used to kill, injure or intimidate any individual or unlawfully to damage or destroy any building, vehicle or real or personal property.'" *Kikumura IV,* 947 F.2d at 73–74.

### D. Sentencing

Kikumura was sentenced on 7 February 1989 ("First Sentencing Hearing"). *Kikumura IV,* 947 F.2d at 74. The conviction exposed Kikumura to the statutory penalty of one hundred years in prison, fines of several millions dollars, plus a supervised release term of three years. *Kikumura II,* 706 F.Supp. at 334.

The Department of Probation ("Probation") computed the Guideline range for imprisonment pursuant to the Sentencing Commission Guidelines Manual ("Guidelines") and the Sentencing Reform Act, 18 U.S.C. § 3551 *et seq. Kikumura I,* 706 F.Supp. at 334. Probation calculated the range of imprisonment to be a total of from twenty-seven to thirty-three months for all twelve counts, based upon a criminal history of one and a total offense level of eighteen. *Id.* A term of supervised release of not less than two and not more than three years and a fine in the range of $6,000 and $60,000. *Id.*

---

**2.** Specifically, Kikumura was charged with 1) interstate transportation of explosives without a permit, in violation of 18 U.S.C. § 842(a)(3)(A); 2) interstate transportation of explosives knowing they would be used to harm persons or property, in violation of Section 844(d); 3) illegal possession of a firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5); 4) three counts of unlawful possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d); 5) three counts

of unlawful possession of firearms not identified by a serial number, in violation of 26 U.S.C. § 5861(I); use of an altered passport, in violation of 18 U.S.C. § 1543; 6) use of a passport issued for the use of another, in violation of 18 U.S.C. § 1544; and 7) possession of a nonimmigrant visa procured by fraud, in violation of 18 U.S.C. § 1546(a). *See United States v. Kikumura,* 918 F.2d 1084, 1094 & n. 6 (3d Cir.1990) (*"Kikumura III"*).

At sentencing, an upward departure was imposed upon a "finding the Sentencing Commission did not adequately consider (and in fact did not consider) the kind or degree of conduct at issue." *Kikumura II,* 706 F.Supp. at 334. Kikumura was sentenced to a term of three hundred-sixty months, comprised as follows: one hundred twenty months on each of counts one and two, to run concurrently with each other; sixty months on count three, to run consecutively to the sentence imposed on counts one and two; one hundred twenty months on each of counts four through nine, to run concurrently with each of counts four through nine, but consecutively to sentence imposed on count three; sixty months on each of counts ten through twelve, to run concurrently with each of counts ten through twelve, but consecutively to the sentence imposed on counts four through nine. *Id.* A term of three years supervised release and a special monetary assessment in the total amount of $600.00 was imposed. *Id.* at 334–35.

The departure was based upon facts as found at the suppression hearing, the trial facts as stipulated by Kikumura, the testimony at the First Sentencing Hearing and other reliable evidence offered at the First Sentencing Hearing.[3] *Kikumura II,* 706 F.Supp. at 335. The findings of fact upon which the upward departure was based are summarized below.[4]

### a. *Kikumura's Background*

Kikumura is a member of the Japanese Red Army ("JRA"), a terrorist organization. *Kikumura II,* 706 F.Supp. at 335. Kikumura received training from, and has trained members of, the JRA. *Id.*

In May, 1986, Kikumura was arrested when he attempted to enter the Netherlands through Schiphol Airport in Amsterdam. *Kikumura II,* 706 F.Supp. at 336. Netherlands authorities searched Kikumura's luggage and discovered a cardboard drink container filled with over two pounds of a high explosive. *Id.* The authorities also found a Sanyo radio concealing six detonators of the type used to detonate explosives. *Id.* "[T]he placement and concealment of the detonators was so well done they appeared to be integral parts of the radio." *Id.* After Kikumura spent four months in a Netherlands prison, his prosecution was discontinued—not because he was innocent—but due to an technical illegality under Netherlands law. *Id.*

In autumn 1986, Kikumura arrived at a camp located in the Bekaa Valley of Lebanon ("Bekaa Valley Camp"). *Kikumura II,* 706 F.Supp. at 335. The Bekaa Valley Camp was maintained by a terrorist organization, a member of which was the CI who supplied data to the FBI. *Id.* Beginning in as early as 1984, three members of the JRA attended the Bekaa Valley Camp for one week to receive "instruction on different methods of combining chemicals to make explosives and detonators and the construction of improvised bombs." *Id.* at 335–36. The CI was informed the one week training session was the commencement of a more cohesive training session for the JRA. *Id.* at 336.

Two of the individuals from the JRA returned to the Bekaa Valley Camp in January, 1985. They received training on the manufacture of explosives using ammonium nitrate and aluminum powder. *Kikumura II,* 706 F.Supp. at 336. They also practiced using flash bulbs as detonators and preparing mercury fulminate detonators.[5] *Id.*

**3.** Among the reliable evidence offered at the First Sentencing Hearing was an affidavit, submitted from Michael R. Hartman, Special Agent of the Federal Bureau of Investigation ("FBI") ("Hartman Affidavit"). *See Kikumura II,* 706 F.Supp. at 342. The Hartman Affidavit detailed conversations with a confidential informant ("CI"), who provided information to the FBI concerning activities inside a terrorist training camp in Lebanon. The Hartman Affidavit was admitted over the objection of Kikumura because it contained information which, in itself and in conjunction with other evidence, offered "more than suffi-

cient indicia of reliability to support [its] probable accuracy." *Id.*

On appeal, the Circuit held the Hartman Affidavit to be reasonably trustworthy and that consideration of the Hartman Affidavit was proper. *Kikumura III,* 918 F.2d at 1102–04.

**4.** The following facts are meant to provide a summary. A more detailed factual basis can be found in the *Kikumura II* opinion.

**5.** These items—ammonium nitrate, aluminum powder, mercury and flash bulbs—were among

In April 1985, three Japanese, including Junzo Okudaira ("Okudaira"), arrived at the Bekaa Valley Camp to conduct "research on remote control devices." *Kikumura II*, 706 F.Supp. at 336. Between April 1985 and May 1986, JRA members made short, sporadic trips to the Bekaa Valley Camp. Between spring and autumn of 1986, other members of the JRA moved into and began to construct barrack housing in the Bekaa Valley Camp. *Id.* As stated, Kikumura arrived at the Bekaa Valley Camp in autumn 1986.

The CI described "Kikumura as a 'country boy' who spoke English[,] . . . trained other JRA members in the use of rifles and handguns . . . [and] was a competent commando with a knowledge of explosives." *Kikumura II*, 706 F.Supp. at 336. Kikumura also admitted to the CI he had been to many countries and had previously been arrested in another country. *Id.* at 336–37. The CI was told by another member of the JRA at the Bekaa Valley Camp that the United States was the main enemy of the JRA and the JRA planned to strike the United States. *Id.* at 337.

### b. *Current Offense Conduct*

In February 1988, while in Europe, Kikumura obtained several visas for entry into several European countries and the United States. He opened a bank account in Switzerland and obtained a valid Japanese passport which was altered to show his likeness. *Kikumura II*, 706 F.Supp. at 337.

Upon entry into the United States, Kikumura "rented an apartment [in Manhattan], purchased a 1980 Mazda automobile and traveled approximately 7000 miles to many out-of-the-way locations to purchase and assemble the components for his destructive devices." *Kikumura II*, 706 F.Supp. at 337.

On 31 March 1988, Kikumura purchased a container of epoxy, a can of contact cement, electrical tape and all purpose wire at a K–Mart in Lexington, Kentucky. *Kikumura II*, 706 F.Supp. at 337. The tape and wire

matched components of the three bombs retrieved from the Kikumura Vehicle. *Id.* at 338.

On 1 April 1988, Kikumura purchased various wires, an on-off switch, electric jacks and an electric circuit tester[6] from Electronic Supply, Inc. in Huntington, West Virginia. *Kikumura II*, 706 F.Supp. at 338. The items "were later used by [Kikumura] in making the electronic time-delay fuzing device." *Id.*

On 9 April 1988, Kikumura purchased a hacksaw, carton sealing tape, a file and a vinyl suitcase. *Kikumura II*, 706 F.Supp. at 338. The hacksaw was used to remove the tops of fire extinguishers, transforming them into bomb casings which were then filled with gun powder and lead shot. A flash bulb suspended from the top of each bomb casing was placed and wired to initiate the explosion of the gun powder. *Id.*

On 10 April 1988, at a Clover Department Store in Cheltenham, Pennsylvania, Kikumura purchased two packages of Sylvania flash bulbs, a package of "D" cell batteries and a carton of cigarettes. *Kikumura II*, 706 F.Supp. at 338. These materials were recovered from the vehicle of Kikumura, including flash bulbs from inside each of the bombs. *Id.* The flash bulbs were connected to wires which were to be used by Kikumura to connect the bombs to the time-delay fuzing system. *Id.* Three other items recovered from the vehicle of Kikumura were two cans of aluminum powder, ammonium nitrate and mercury from several thermometers. *Kikumura II*, 706 F.Supp. at 338.

On 11 April 1988, Kikumura attempted to sell his car and to rent another in Philadelphia, but was unsuccessful. *Kikumura II*, 706 F.Supp. at 338. Kikumura attempted to obtain a rental car by offering $500.00 and then $1,000 to the owner of a rental agency. *Id.*

### c. *Construction of the Anti–Personnel Bombs*

As discussed, the three bombs were constructed from modified fire extinguishers act-

---

the items recovered from the Kikumura Vehicle. *Id.*

6. "A circuit tester, an instrument used to ensure that a wiring system is safe, can be used to test the safety of a fuzing system before connecting it to a bomb." *Kikumura II*, 706 F.Supp. at 338.

ing as bomb casings. *Kikumura II*, 706 F.Supp. at 338. Flash bulbs were suspended from a wire through the center of each bomb casing while the other end of the wire remained on the outside of the casing for connection to individual time-delay fuzing systems. *Id.* at 338–39. More than three pounds of gun powder were poured into the bomb casings, packed with plastic and cardboard, and followed by three pounds of lead shot. *Id.* at 339. "[T]his lead shot was clearly intended to produce 'personal injuries,'" *id.*, as it would spray "shrapnel in a wide pattern and cause indiscriminate death and horrible injuries." *Id.* Because lead shot has no utility in an explosive device used merely to cause damage to property, its existence was found to further demonstrate an intent by Kikumura to create anti-personnel bombs. *Id.*

#### d. *Parallel Terrorist Conduct*

On 5 April 1986, a terrorist bomb exploded at a discotheque in West Berlin, killing an American soldier and injuring 50 other Americans. *Kikumura II*, 706 F.Supp. at 339. On 14 April 1986, after obtaining strong evidence the West Berlin bombing was the work of Libya, the Government effected air attack on Libyan targets. *Id.*

On 14 April 1988, a powerful car bomb exploded outside an America U.S.O. club in Naples, Italy, killing five people and injuring eighteen others. *Kikumura II*, 706 F.Supp. at 339. Fingerprint samples identified Okudaira, an associate of Kikumura at the Bekaa Valley Camp, as the prime suspect in the Naples bombing. *Id.*

The mission embarked on by Kikumura, and paralleled by Okudaira in Italy, was found to appear to be a retaliatory attack on the second anniversary of the United States raid in Libya. *Kikumura II*, 706 F.Supp. at 339. The evidence was found to "strongly

suggest[.]" Kikumura planned to detonate his bombs in New York City at approximately the same time as the Naples bombing. *Id.* At the time of his arrest on 12 April 1988, the bombs were fully assembled and ready to be detonated. Kikumura had in his possession an airline schedule bearing the handwritten notation, "Friday morning, 330.00, 4/15." *Id.*

As stated, these factual findings, among others, formed the basis for an upward departure from the Guideline range of between twenty-seven and thirty-three months to an aggregate sentence of thirty years.[7] Although a preponderance of the evidence standard was employed, it was held the evidence would also surpass a clear and convincing evidence standard. *Kikumura II*, 706 F.Supp. at 345 & n. 28.

#### E. *First Appeal*

On appeal ("First Appeal"), Kikumura raised three arguments. *Kikumura IV*, 947 F.2d at 74. Kikumura challenged the finding that the bombs were intended to kill persons was clearly erroneous. *Id.* Kikumura also argued an upward departure was barred because the Guidelines already took into account all aspects of his criminal activity. *Id.* Finally, Kikumura argued if the departure was permissible under the Guidelines, the extent of the departure was unreasonable. *Id.*

The Circuit rejected the first two arguments. It applied a clear and convincing standard to uphold the finding Kikumura intended to kill people. *Kikumura III*, 918 F.2d at 1101, 1104. "Because Kikumura requested no higher standard of proof in his sentencing memorandum, [the Circuit] assume[d] without deciding that the clear and convincing standard [was] sufficient." *Id.* at 1101. The Circuit also upheld the departure as legally permissible pursuant to 18 U.S.C. § 3553(b) because "none of the offense

---

**7.** Multiple reasons were given for the departure. Kikumura intended to cause multiple deaths and injuries, as evidenced by the inclusion of large quantity of lead shot. *Kikumura II*, 706 F.Supp. at 341. Kikumura intended to detonate the bombs after he left the scene, as evidenced by the time-delay fuzing device. *Id.* Kikumura's intent to kill and maim whomever happened to be near his bombs was "unusually heinous and brutal,"

constituting a departure for extreme conduct, pursuant to U.S.S.G. § 5K2.8. *Id.* The criminal history category of Kikumura significantly underrepresented the seriousness of his criminal history and likelihood he will commit future crimes. *Id.* The nature of the crime endangered national security, public health and safety. *Id.* at 342. Kikumura intended to disrupt the governmental functions of the United States. *Id.*

[G]uidelines under which Kikumura was sentenced adequately t[ook] into consideration Kikumura's intent to commit murder." *Id.* at 1109. The Circuit held Kikumura's intent to commit murder was "an eminently reasonable basis for an upward departure." *Id.* at 1110.

The Circuit, however, employed a novel sentencing methodology to determine whether the upward departure was reasonable. *Kikumura III*, 918 F.2d at 1110. The Circuit turned to the Guidelines and applied "analogic reasoning" to assess the reasonableness of the departure. *Id.* at 1111. The court reasoned "[i]t would throw the structure of the [G]uidelines out of kilter to say that a defendant may receive more time on a 'departure' than he could have received had he been convicted of the crimes leading the judge to depart." *Id.* at 1112.

The Circuit first analogized Kikumura to a category VI offender based upon his criminal history and terrorist background. *Kikumura III*, 918 F.2d at 1113. It then looked to the intent to kill finding and analogized that finding to the attempted murder Guideline, which carries a base offense level of twenty. *Id.* at 1115. The offense level was increased by five to reflect the harm and casualties the bombs would have caused had they been detonated. *Id.*

The Circuit then applied a two-level increase to the analogy for Kikumura's "extraordinarily meticulous planning." *Kikumura III*, 918 F.2d at 1116. The Circuit declined to depart upwards on the basis of an intent to disrupt a Governmental function, *id.* at 1117, but did adjust upward five levels for extreme conduct and endangerment of public safety. *Id.* at 1118. The analogized offense level was calculated to be thirty-two based on these factors, bringing the applicable guideline range to be between two hundred ten to two hundred sixty-two months. *Id.* at 1119. The sentence was vacated and the matter remanded for resentencing consistent with those conclusions. *Id.*

### F. Re-sentencing Proceeding After Remand

On 1 March 1991, Kikumura was re-sentenced to a term of two hundred sixty-two months, a three year term of supervised release, and a special assessment of $600.00. *Kikumura IV*, 947 F.2d at 75.

### G. Second Appeal

On his second appeal ("Second Appeal"), Kikumura argued "his conviction under [Section 844(d) ] was 'too slender a reed' to support consideration at the sentencing of his specific intent to commit multiple murder when he had not been convicted of that crime." *Kikumura IV*, 947 F.2d at 75. Kikumura argued he was entitled to the "entire panoply of rights" that apply at trial. *Id.* at 75–76.

The Circuit did not consider this argument. The Circuit held "Kikumura explicitly waived any objection to the [G]overnment's introduction of evidence of his intent to kill at sentencing." *Kikumura IV*, 947 F.2d at 76. Kikumura "agreed … the [G]overnment would be free to introduce whatever evidence it deemed appropriate at the [First Sentencing Hearing]" and "Kikumura did not object [when the Government did introduce evidence of his intent to kill at sentencing]." *Id.* Kikumura failed to preserve the issue for appeal. *Id.*

Moreover, the Circuit noted the upward departure was explicitly held to be legally permissible on direct appeal. *Kikumura IV*, 947 F.2d at 76. Accordingly, the Circuit stated "[t]he district court [at re-sentencing] … was bound to follow that mandate; it had no authority to reconsider the issue." *Kikumura IV*, 947 F.2d at 76.

Kikumura also argued "the factual findings at a sentencing proceeding must be supported by proof beyond a reasonable doubt and that hearsay may only be admitted at sentencing if it satisfies the Confrontation Clause." *Kikumura IV*, 947 F.2d at 76. In response to that argument, the Circuit stated: "Kikumura cannot continue to litigate questions already decided by this court in a prior proceeding. Our observation in *Kikumura* [*III* ], that we may require a more demanding standard of proof at sentencing proceedings 'at some later date' … was not an invitation to Kikumura to bring a second appeal religitating the issue and urging that

higher standard upon us." *Id.* at 77. The Circuit held the standard of proof of clear and convincing evidence, arrived at in the earlier appeal, was now the "law of the case." *Id.*

Kikumura finally argued it was error to deny a continuance at re-sentencing to allow Kikumura the opportunity to obtain the counsel of his choice. *Kikumura IV,* 947 F.2d at 78. This argument, as well, was rejected by the Circuit. *Id.*

### H. Habeas Petition

The Habeas Petition was filed on 12 August 1996. After briefing by the parties, the Habeas Petition was dismissed without prejudice for violation of the page limitations established by the Local Rules for the District of New Jersey. On 1 April 1997, the parties were granted leave from the page restrictions and a briefing schedule was established. *See* 1 April 1997 Order.

On 2 April 1997, the parties were granted further leave from the page restrictions to address the following issue:

> Whether the [Habeas Petition] enables this court to re-open sentencing and impose the original sentence pursuant to *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

*See* 2 April 1997 Order. Thereafter, Kikumura requested an increase in the page limit, which was denied by order, dated 27 May 1997.

On or about 3 June 1997, Kikumura filed a request for discovery under seal. The order granting the request, signed by Magistrate Judge Dennis M. Cavanaugh ("3 June 1997 Order"), was filed under seal. Because it was filed under seal, the Clerk's Office neglected to mail the 3 June 1997 Order to the parties. The parties were not advised of the 3 June 1997 Order until 27 June 1997 when they inquired of its status.

Kikumura filed the 11 July 1997 Motion seeking leave to supplement the Moving Brief, lift the protective order in the 3 June 1997 Order and receive appointment of counsel. As discussed, the 11 July 1997 Motion was denied.

In the Habeas Petition, Kikumura argues his sentence violates Due Process, Double Jeopardy, the Separation of Powers, as well as various Guideline and statutory principles and policies. In addition, Kikumura advances a claim of newly discovered evidence and requests that an interview with a material witness be ordered to develop that claim.

The newly discovered evidence is based upon certain allegations of Dr. Frederic Whitehurst ("Whitehurst"), a Special Supervisory FBI Agent. Whitehurst alleges the FBI Special Agent who testified about the bombs found in the Kikumura Vehicle, James Thomas Thurman ("Thurman"), "testified outside of his areas of expertise and provided false information and misleading testimony at the First Sentencing Hearing." Moving Brief at 8 (citing *The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosive–Related and Other Cases* ("Report"), attached to Garber Cert. as Exhibit 6).

### Discussion

#### A. Standard of Review under 28 U.S.C. § 2255

Section 2255 of Title 28 of the United States Code ("Section 2255") provides a means of collaterally attacking a sentence imposed after a conviction. *United States v. Cannistraro,* 734 F.Supp. 1110, 1119 (D.N.J.), *aff'd mem.,* 919 F.2d 133 and *aff'd mem.,* 919 F.2d 137 (3d Cir.1990), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991). Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence....

Section 2255.

 "The purpose of Section 2255 was to require a [F]ederal prisoner to exhaust his

remedies in the courts of the District and Circuit in which he was convicted and sentenced, and to apply to the Supreme Court, on Certiorari from a denial of such remedies, before seeking release on *habeas corpus.*" *Crismond v. Blackwell,* 333 F.2d 374, 377 (3d Cir.1964); *see also Millan–Diaz v. Parker,* 444 F.2d 95, 96 (3d Cir.1971); *Galante v. United States,* 437 F.2d 1164, 1165 (3d Cir. 1971). Strong interests in the finality of judgments prevents an error which may justify reversal on direct appeal from supporting a collateral attack on a final judgment. *United States v. Cleary,* 46 F.3d 307, 310 (3d Cir.1995) (quoting *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979)), *cert. denied,* 479 U.S. 938, 107 S.Ct. 418, 93 L.Ed.2d 369 (1986).

■ The grounds for collateral attack of a sentence pursuant to Section 2255 are narrowly limited. *United States v. Biberfeld,* 957 F.2d 98, 102 (3d Cir.1992); *Addonizio,* 442 U.S. at 184, 99 S.Ct. at 2239–40. The Circuit has recognized "not all non-constitutional errors in criminal proceedings enable a prisoner to bring an action under [Section] 2255 for relief." *Diggs v. United States,* 740 F.2d 239, 242 (3d Cir.1984); *accord United States v. Vancol,* 778 F.Supp. 219, 222 (D.Del.1991), *aff'd,* 970 F.2d 901 (3d Cir. 1992).

■ A motion under Section 2255 will be granted "only if the sentence results in 'a fundamental defect which inherently results in a complete miscarriage of justice' or 'an omission inconsistent with the rudimentary demands of fair procedure.'" *Cannistraro,* 734 F.Supp. at 1119 (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417, *reh'g denied,* 369 U.S. 808, 82 S.Ct. 640, 7 L.Ed.2d 556 (1962)); *Addonizio,* 442 U.S. at 185, 99 S.Ct. at 2240; *United States v. DeLuca,* 889 F.2d 503, 506 (3d Cir.1989), *cert. denied,* 496 U.S. 939, 110 S.Ct. 3222, 110 L.Ed.2d 669 (1990); *Vancol,* 778 F.Supp. at 222–23. Similarly, errors of fact will not provide a basis for relief unless

" 'the errors were of the most fundamental character, that is, such as rendered the proceeding itself irregular and invalid.' " *Addonizio,* 442 U.S. at 185–86, 99 S.Ct. at 2241 (quoting *United States v. Mayer,* 235 U.S. 55, 69, 35 S.Ct. 16, 19–20, 59 L.Ed. 129 (1914)).

The Supreme Court has "long and consistently affirmed that a collateral challenge may not do service for an appeal." *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816, *reh'g denied,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *see Addonizio,* 442 U.S. at 184–85, 99 S.Ct. at 2239–40; *Government of Virgin Islands v. Nicholas,* 759 F.2d 1073, 1074 (3d Cir.1985) ("A [S]ection 2255 petition is not a substitute for an appeal").

■ A petitioner's failure to raise a particular error either at trial or on direct appeal generally precludes the assertion of that error for the first time in a collateral attack under Section 2255. *See United States v. Essig,* 10 F.3d 968, 979 (3d Cir.1993); *United States v. DeRewal,* 10 F.3d 100, 105 n. 4 (3d Cir.1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994); *United States v. Osser,* 864 F.2d 1056, 1061 (3d Cir.1988); *United States v. Grasso,* 468 F.Supp. 264, 266 (E.D.Pa.), *aff'd,* 612 F.2d 575 (3d Cir.1979). Where a petition is predicated upon information known by the defendant and his counsel at the time of the trial or at a point at which an appeal could have been taken, such knowledge is fatal to a section 2255 claim. *See Biberfeld,* 957 F.2d at 104; *Brown v. United States,* 556 F.2d 224, 227 (3d Cir.1977); *see also United States v. Keller,* 902 F.2d 1391, 1393–94 (9th Cir. 1990); *Chin v. United States,* 622 F.2d 1090 (2d Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981).

■ Where a section 2255 motion rests on issues not raised at trial or on direct appeal, the petitioner bears the burden of demonstrating both "cause" to excuse the procedural default and that "actual prejudice" will result from the errors at issue.[8]

---

**8.** The Supreme Court has established a narrow exception to this rule. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a [F]ederal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).

*Frady,* 456 U.S. at 167, 102 S.Ct. at 1594; *Essig,* 10 F.3d at 979; *DeRewal,* 10 F.3d at 105 n. 4; *Biberfeld,* 957 F.2d at 104.

■ "[T]he existence of cause for a procedural default must ordinarily turn on whether some objective factor *external to the defense* impeded counsel's effort to comply with the ... procedural rule." *Murray,* 477 U.S. at 488, 106 S.Ct. at 2649 (emphasis added); *see Essig,* 10 F.3d at 979. The Supreme Court has explained:

> Objective factors that constitute cause include "interference by officials" that makes compliance with [the exhaustion requirement] impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "ineffective assistance of counsel ... is cause." Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant,* 499 U.S. 467, 493–94, 111 S.Ct. 1454, 1469–70, 113 L.Ed.2d 517 (quoting *Murray,* 477 U.S. at 486–88, 106 S.Ct. at 2644–45), *reh'g denied,* 501 U.S. 1224, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991).

■ To establish prejudice, the petitioner must show "not merely that the errors at ... trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 170, 102 S.Ct. at 1596 (emphasis in original); *see Biberfeld,* 957 F.2d at 105.

## B. *Due Process Claim*

Kikumura argues the large departure based on an uncharged crime violated his right to due process and a trial by jury. Moving Brief at 13. Kikumura argues: "When a sentencing factor, which is itself a separate uncharged crime is so central to punishment that it acts as the 'tail which wags the dog of the substantive offense,' it is no longer a sentencing factor, but a separate crime subject to the full panoply of constitutional protections (*i.e.* formal charging and trial by jury with all the rights, including proof beyond a reasonable doubt and the full

press of the confrontation clause)." *Id.* at 13. Kikumura further argues application of the reasonable doubt standard invalidates the departure and "the confrontation clause blocks the ... Hartman Affidavit ... that linked [Kikumura] to terrorist activity." *Id.* at 15.

Kikumura attempted to raise an identical argument in his Second Appeal. There, Kikumura argued that "the factual findings at a sentencing proceeding must be supported by proof beyond a reasonable doubt and that hearsay may only be admitted at sentencing if it satisfies the Confrontation Clause." *Kikumura IV,* 947 F.2d at 76. The Circuit held Kikumura to be procedurally barred. It stated: "Kikumura cannot continue to litigate questions already decided by this court in a prior proceeding. Our observation in *Kikumura [III],* that we may require a more demanding standard of proof at sentencing proceedings 'at some later date' ... was not an invitation to Kikumura to bring a second appeal religitating the issue and urging that higher standard upon us." *Id.* at 77. The Circuit held the appropriate standard of proof arrived at in the earlier appeal—clear and convincing evidence—was now the "law of the case" and would not be revisited. *Id.*

Kikumura's failure to raise the issue of a due process violation either at sentencing or on direct appeal precludes the assertion of that issue in a collateral attack. *See Essig,* 10 F.3d at 979; *DeRewal,* 10 F.3d at 105 n. 4 (1993); *Osser,* 864 F.2d at 1061; *Grasso,* 468 F.Supp. at 266. Where a Section 2255 motion rests on issues not raised at trial or on direct appeal, Kikumura bears the burden of demonstrating both "cause" to excuse the procedural default and that "actual prejudice" will result from the errors at issue. *Frady,* 456 U.S. at 167, 102 S.Ct. at 1594; *Essig,* 10 F.3d at 979; *DeRewal,* 10 F.3d at 105 n. 4; *Biberfeld,* 957 F.2d at 104. Section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal. *DeRewal,* 10 F.3d at 105 & n. 4.

Kikumura asserts both cause and prejudice for his procedural default. Moving Brief at 45–55. Kikumura argues his claims were "not fully pressed [at sentencing or on direct appeal] because counsel was ineffective

or because the claims were novel and unavailable." Moving Brief at 45. Trial Counsel for Kikumura were not ineffective nor where the claims currently raised unavailable to Kikumura at the time of the First Appeal. The procedural default of Kikumura will not be excused.

### a. Ineffective Assistance of Counsel

The failure to raise legal arguments constitutes cause for a procedural default only if such failure rises to the level of ineffective assistance of counsel. *Murray,* 477 U.S. at 478, 106 S.Ct. at 2640–41. To establish a claim for ineffective assistance of counsel, Kikumura

[f]irst ... must show that [Trial] [C]ounsel's performance was deficient. This requires showing that counsel made errors so serious that [Trial] [C]ounsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, [Kikumura] must show that the deficient performance prejudiced the defense. This requires showing that [Trial] [C]ounsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see also United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir.1997); *Wells v. Petsock,* 941 F.2d 253, 259 (3d Cir.1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3038, 120 L.Ed.2d 906 (1992). Pursuant to this test, a litigant claiming ineffective counsel "must prove both incompetence and prejudice." *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65); *Berryman v. Morton,* 100 F.3d 1089, 1094–95 (3d Cir.1996). Kikumura argues these principles warrant a finding of ineffective assistance of Trial Counsel.

In support of his argument, Kikumura cites the Circuit opinion in the First Appeal. There, the Circuit declined to conduct an analysis under due process because

[n]either here nor at the district court ... did Kikumura advance the argument that a conviction under [Section] 844(d) is too

slender a reed on which to support consideration at sentencing of defendant's specific intent to commit murder.

*Kikumura III,* 918 F.2d at 1101. With respect to the standard of proof to be applied, the Circuit stated,

Because Kikumura requested no higher standard of proof in his sentencing memorandum, we assume without deciding the clear and convincing standard is sufficient in such cases.

*Id.* Kikumura contends "[t]he Circuit's treatment of the waiver clearly substantiates a claim on this record that counsel's failure to urge for the full relief available under *McMillan* [9] at the district court and appellate court levels constituted ineffective assistance of counsel." Moving Brief at 49.

Kikumura argues there are "[o]ther facts in the record [which] drive the claim [of ineffective counsel] further." Moving Brief at 49. Kikumura argues, although Trial Counsel acknowledged the Government intended to press for a departure fifteen times greater than the Guideline sentence, they "only requested an adversarial hearing with application of the clear and convincing standard of proof and corroboration of hearsay." *Id.* at 49–50.

Kikumura further argues Trial Counsel did not frame their request for a higher standard of proof as one based upon due process of law. Kikumura submits an affidavit from Kuby who states "there was no strategic reason for failing to insist upon the full relief available under *McMillan* at the district court and on appeal." *Id.* at 50 (citing Kuby Affidavit ("Kuby Affidavit"), attached to Garber Cert. at Exhibit 5). Kikumura argues this restricted approach was "beyond the ken of professional standards and inconsistent with the right to effective assistance of appellate counsel." *Id.* at 50–51.

"[T]he reasonableness of counsel's challenged conduct on the facts of the particular case [must be] viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Decisions as to which issues to raise on appeal are committed to the discretion of counsel. *Sistrunk v.*

---

**9.** *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

*Vaughn,* 96 F.3d 666, 670 (3d Cir.1996) (citing *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983)). Counsel is charged with the exercise of professional judgment; "there is no duty to raise every possible claim" on appeal. *Id.* Neither is "there a general duty on the part of defense counsel to anticipate changes in the law." *Id.* (citing *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989)).

Trial Counsel for Kikumura neither overlooked existing authority that would have resulted in a lower sentence for Kikumura nor failed to anticipate a change in authority which would have resulted in a lower sentence. Kikumura is arguing Trial Counsel were ineffective because they did not induce the court to press beyond *McMillan* to employ a beyond a reasonable doubt standard in the factual finding. Kikumura points to no cases which embrace the propositions offered by Kikumura. Indeed, no cases exist which extend *McMillan* beyond the holding of *Kikumura III. See United States v. Watts,* ___ U.S. ___, ___, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997) (surveying the Circuits and noting a few cases have required or acknowledged in dictum a clear and convincing standard in the case of an extreme upward departure); *United States v. Townley,* 929 F.2d 365, 369 (8th Cir.1991) (suggesting but not deciding that due process requires more than preponderance of the evidence standard where inclusion of uncharged drug amounts produced 18–level increase in base offense level and seven-fold increase in sentencing range); *United States v. Lombard,* 102 F.3d 1, 4 (1st Cir.1996) (even the holding of *Kikumura III,* let alone an extension of it, has been "much discussed but generally not followed."), *cert. denied,* ___ U.S. ___, 117 S.Ct. 2437, 138 L.Ed.2d 197 (1997); *United States v. Masters,* 978 F.2d 281, 286–87 (7th Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993).

The failure to argue for a beyond a reasonable doubt standard will not in hindsight label the efforts of Trial Counsel as deficient, especially in light of what Trial Counsel did accomplish. On direct appeal, Trial Counsel effectively argued for a reversal of Kikumura's original sentence of thirty years. The Circuit held the facts of this case required the employment of a clear and convincing standard of proof at sentencing, rather than a standard of preponderance of the evidence. The Circuit, although finding the departure to be legally permissible, held it to be unreasonable and engaged an analogy to limit the departure. The matter was ultimately remanded for re-sentencing with the directive that the sentence should not exceed two hundred sixty-two months.

Kikumura points to language in the *Kikumura III* opinion which he offers to suggest his Trial Counsel were ineffective for failing to argue for the full panoply of trial rights in connection with the upward departure. As stated by the Circuit in *Kikumura IV,* language in *Kikumura III* was not an invitation to Kikumura to relitigate identical issues in subsequent proceedings. The Circuit expressly held the "standard of proof arrived at in *Kikumura [III]* [to be the] 'law of the case'" that should govern in subsequent stages of the same case. *Kikumura IV,* 947 F.2d at 77. As stated, Section 2255 may not be employed to relitigate questions which were raised and considered in earlier proceedings. *Cf. DeRewal,* 10 F.3d at 105 & n. 4.

As recognized in the Kuby Affidavit, Trial Counsel for Kikumura did not urge for the reasonable doubt standard or for the full panoply of procedural protections because of the belief "it would be futile to go back before the Court and ask for heightened relief when, in [their] opinion the Court was not really serious about granting it." Kuby Affidavit, ¶ 13. Trial Counsel neither failed to follow pre-existing law, or to anticipate future developments in the law. The representation of Trial Counsel did not fall below professional standards of reasonableness.

Neither was Kikumura prejudiced because, as will be discussed, the arguments advanced in the Habeas Petition would not have prevailed had they been presented to either the trial court or the appellate court by Trial Counsel.

### b. *Unavailability of Claims*

Kikumura argues: "If ineffective assistance of counsel was not the cause for the default, it was the novelty of the claims." Moving Brief at 51. Kikumura argues because *Kikumura III* was the first court to hold that a defendant had a due process right to challenge the departure on "tail wagging the dog" grounds, he should be excused for the default. Citing *United States v. Thomas*, 961 F.2d 1110 (3d Cir.1992) and *Kikumura III*, Kikumura argues "the errors made by [this court] were understandable because it imposed the sentence 'without the benefit of the principles [the Circuit] announce[d]' on direct appeal." *Kikumura III*, 918 F.2d at 1114. Kikumura argues because the claims were not reasonably available to him prior to *Kikumura III*, he should be excused from the default. Moving Brief at 55.

This argument is not convincing. Trial Counsel chose to argue for a clear and convincing standard because they believed "it would be futile" to ask for heightened relief. *See* Kuby Affidavit, ¶ 13. As will be discussed, the arguments raised by Kikumura in the Habeas Petition do not have merit. The argument that Kikumura is entitled to a standard of proof at sentencing which equates the panoply of rights established at a criminal trial is unavailing to him now, as it was at the time of sentencing and on appeal.

### c. *Reasonable Doubt Standard is not Applicable*

■ Kikumura argues he was "convicted of possession of explosives with the intent to damage property and other explosive possession and passport offenses that carried a maximum guideline sentence of [thirty-three] months. Even though none of these offenses contained an element of intent to kill, the ... Circuit permitted a departure to nearly [twenty-two] years based on such conduct." Moving Brief at 13–14. Kikumura argues he was "never formally charged with the specific intent to kill and he was deprived of a jury trial on this charge." Moving Brief at 15.

Kikumura incorrectly characterizes the basis for the upward departure. Kikumura was not punished for an uncharged crime of attempted murder. *See* Moving Brief at 15.

Rather, the upward departure was based upon a finding that Kikumura possessed explosives with the intent to cause multiple deaths. *Kikumura II*, 706 F.Supp. at 341 ("[B]ecause Kikumura intended to cause death and horrible injury, a departure from the guidelines is warranted. Moreover, because [Kikumura's] bombs were intended to cause multiple deaths and injuries, as did the Naples bomb, greater departure is warranted."). The intent to kill was not an element of the offense, requiring proof beyond a reasonable doubt. Rather, the intent to kill was a sentencing factor. The Circuit agreed the intent to kill was a proper legal basis for the upward departure. *Kikumura III*, 918 F.2d at 1104–09.

The Circuit thereafter addressed the reasonableness of the extent of the departure and determined the aggravating factor of the intent to kill should not be treated more severely than an actual attempt to commit murder. *Id.* at 1112. The finding that Kikumura intended to use his bombs to kill people suggested an analogy to the attempted murder Guideline. *Id.* at 1115. The analogy was used by the Circuit to place a limit upon the extent of the intent to kill departure.

Kikumura begins his argument by citing *McMillan*. *McMillan* addressed the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa.C.S.A. § 9712 (the "Act"). The Act provided that anyone convicted of certain enumerated felonies be subject to a mandatory minimum sentence of five years imprisonment if it is found by a preponderance of the evidence that the offender visibly possessed a firearm during the commission of the offense. *McMillan*, 477 U.S. at 79, 106 S.Ct. at 2412–13. The Act was attacked under the due process clause and the Sixth Amendment right to a trial by jury. "*McMillan* held that a preponderance standard was generally constitutional but suggested that a different question would be presented if the magnitude of a contemplated departure is sufficiently great that the sentencing hearing can be fairly characterized as 'a tail which wags the dog of the substantive offense.'" *Kikumura III*, 918 F.2d at 1101. The Court upheld the Act and concluded the preponderance standard was sufficient to sat-

isfy due process. *McMillan*, 477 U.S. at 91, 106 S.Ct. at 2418–19.

The Circuit was aware of *McMillan*, and indeed cited *McMillan*, in reaching the conclusion "that the clear and convincing standard is, under these circumstances, implicit in the statutory requirement that a sentencing court 'find' certain considerations in order to justify a departure...." *Kikumura III*, 918 F.2d at 1102. The Circuit "reserve[d] judgment on the question whether it is also implicit in the due process clause itself." *Id.* This reservation, however, did not undermine the finding that the clear and convincing standard was the standard "the factfinder should have applied in the first instance[,]" *id.*[10] at 1101, and later, on Second Appeal, held to be the "law of the case." *Kikumura IV*, 947 F.2d at 77.

The Circuit did address due process issue with respect to the admissibility of the Hartman Affidavit. *Kikumura III*, 918 F.2d at 1103. The Circuit held, "at a sentencing hearing, where the court departs upward dramatically from the applicable [G]uideline range, intermediate standards should apply. Accordingly, factual findings must be supported by clear and convincing evidence and hearsay statements cannot be considered unless other evidence indicates that they are reasonably trustworthy." *Id.* (footnote omitted). The Circuit explicitly addressed the requirements of the confrontation clause, *id.* at 1102–03, as well as due process, *id.* at 1103 & n. 21, in so holding. The Circuit further held that "[i]f, at some later date, [it] were to require a more demanding standard of proof, this would not affect the applicability of [the] new standard of admissibility for hearsay

statements at sentencing." *Id.* at 1103 & n. 22.

Kikumura cites no case law, and none could be found, which employed a reasonable doubt standard at a sentencing hearing.[11] Indeed, case law interpreting *Kikumura III* has rejected the reasonable doubt standard. *See, e.g., Lombard,* 72 F.3d at 175 ("a defendant has no right under the Due Process Clause to have his sentencing determination be confined to facts proved beyond a reasonable doubt"); *United States v. Mobley,* 956 F.2d 450, 458 & n. 4 (3d Cir.1992) (courts have rejected application of reasonable doubt standard to extrinsic crimes used to enhance sentence). *Accord Watts,* —— U.S. at —— & n. 2, 117 S.Ct. at 636 & n. 2 (acknowledging divergence amount circuits "as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based upon clear and convincing evidence," not beyond a reasonable doubt).

The Circuit, moreover, has refused to expand *Kikumura III* beyond the clear and convincing standard to beyond a reasonable doubt, even where the departure is extreme. *United States v. Baird,* 109 F.3d 856, 865 n. 8 (3d Cir.1997) ("In rare circumstances ... the sentencing hearing may become the 'tail which wags the dog of the substantive offense.' ... In such cases, the fact finding underlying the departure must be established by clear and convincing evidence."); *United States v. Pollard,* 986 F.2d 44, 46 (3d Cir.1993) ("There is no statutory or constitutional requirement that a defendant be convicted of conduct before the conduct may be considered in sentencing. Indeed, the conduct need not even be shown beyond a rea-

---

**10.** Although the facts at the First Sentencing Hearing were found pursuant to a preponderant standard, it was noted that "the evidence [was] sufficient to make the[] findings under a clear and convincing standard" because the evidence was strong, credible, reliable and persuasive. *Kikumura II*, 706 F.Supp. at 345 n. 28. "Even if a clear and convincing standard were deemed to be appropriate, the same findings would result." *Id.*

**11.** Kikumura argues there is specific authority for the proof beyond a reasonable doubt standard. Reply Brief at 4. Kikumura cites *United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996), which stated: "[T]he Court may examine wheth-

er the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such a clear and convincing evidence or even beyond a reasonable doubt where appropriate." This language is dicta. The defendants in that case received sentences of one hundred eighty-eight months and two hundred months, although the base offense level of eighteen recommended sentences between twenty-seven and thirty-three months. *Id.* at 55. The Second Circuit affirmed the departure based on uncharged or acquitted conduct, which the district court found to be proven by "compelling" evidence or "at least a preponderance of the evidence." *Id.* at 57.

sonable doubt, but only by a preponderance"), *cert. denied,* 508 U.S. 956, 113 S.Ct. 2457, 124 L.Ed.2d 671 (1993); *Mobley,* 956 F.2d at 459 (where departure is extreme, clear and convincing standard applies); *cf. United States v. Seale,* 20 F.3d 1279, 1288 (3d Cir.1994) (clear and convincing standard applies to extreme upward departure as to fine).[12]

Kikumura's reference to *Thomas,* 961 F.2d at 1110 does not compel a different conclusion. Kikumura cites *Thomas* for the proposition that a departure cannot be used as a "convenient detour" around the Guidelines to obtain "additional punishment for an uncharged crime, 'unfettered by the constraints of producing admissible evidence and proving [the] case beyond a reasonable doubt.'" Moving Brief at 21 (citing *Thomas,* 961 F.2d at 1121).

In *Thomas,* the basis for the upward departure was that the Government could have, but did not, charge possession of a firearm by a convicted felon, which would have carried a statutory fifteen year mandatory sentence. *Id.,* 961 F.2d at 1119. The Circuit held this to be unfair, especially in light of the plea agreement in which the Government agreed to forego the fifteen year charge. *Id.* at 1120–21. The Circuit held "[i]t would be a dangerous proposition to allow district courts to base upward departures on crimes that were not actually charged." *Id.* at 1121.

*Thomas* was later held to be confined to the "particular circumstances presented by that case." *Baird,* 109 F.3d at 867. In *Baird,* the Circuit held "conduct not formally charged or not an element of the offense can be considered at sentencing; if such information can be considered in determining the

applicable [G]uideline range ..., then such information can be considered in determining whether to depart from that range...." *Id.* at 863; *see also Watts,* —— U.S. at ——, 117 S.Ct. at 638 ("jury's verdict of acquittal does not prevent sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"). The Circuit held, "[t]o the extent *Thomas* is inconsistent with *Watts* [ (and *Baird* ) ], *Thomas* will be deemed without effect." *Id* at 866.

Even if the holding of *Thomas* was not held by the Circuit to be narrow, it would be distinguishable here. In *Thomas,* the Government attempted to get through the "back door" sentencing phase what it chose not to bring through the "front door" charging phase. *Thomas* 961 F.2d at 1121. The result was largely due to the Circuit's "irritation with the [G]overnment's position relative to those facts...." *Baird,* 109 F.3d at 866.

Here, Kikumura and his Trial Counsel agreed to a trial on stipulated facts and were aware prior to doing so that the Government intended to seek a substantial upward departure at sentencing based upon the intent to kill. There was no Governmental misconduct. Unlike *Thomas,* there is no evidence of charge manipulation whereby the Government held back at its whim a charge that was not readily available. Indeed, had the Government charged Kikumura with attempted murder, and had Kikumura been acquitted on that count, *Watts* holds "a sentencing court may consider conduct of which a defendant has been acquitted." *Watts,* —— U.S. at ——, 117 S.Ct. at 636.

---

12. Kikumura argues *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) also requires a full array of rights. Moving Brief at 17. *Mathews* held that "some form of hearing is required before an individual is ... deprived of a property interest." *Id.* at 333, 96 S.Ct. at 902. The Court employed a balancing test to determined the degree of protection required under the Due Process Clause. *Id.* at 334–35, 96 S.Ct. at 902–03.

Kikumura was afforded sufficient due process. Kikumura was given a bench trial and a sentencing hearing, as well as two appeals.

[O]nce the reasonable doubt standard has been applied and the defendant has been convicted,

'the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him.' ... The maximum length of the deprivation of liberty has also been determined legislatively. Thus, all that is left to determine at sentencing is where in the permissible zone the defendant's sentence will fall. Although this decision can be, and most often is critical, it is rarely ever as crucial as the initial finding guilt.

*United States v. McDowell,* 888 F.2d 285, 290 (3d Cir.1989). Kikumura's sentence was within the statutory maximum of one hundred years.

Kikumura argues he would have been acquitted for attempted murder at trial because "[i]ntent never ripened to the point of attempted murder, there was insufficient evidence of a target, and the government needed to rely upon double hearsay to imply motive." Moving Brief at 22. Kikumura argues the Government "exploited the stipulation by going as far as possible with an intent to kill finding, and ultimately obtained what turned out to be an unconstitutional sentence." Moving Brief at 23–24. Kikumura argues the departure unfairly "compensated" for the Government's failure to charge attempted murder. *Id.* at 20.

As stated, the attempted murder was not the basis for the upward departure. The attempted murder Guideline was applied by analogy by the Circuit to place an upper limit on the extent of the intent to kill upward departure. It was not intended to act as the equivalent of an attempted murder conviction. The Circuit held the upward departure was legally permissible because "none of the offense guidelines under which Kikumura was sentenced adequately takes into consideration Kikumura's intent to commit murder." *Kikumura III,* 918 F.2d at 1109. The attempted murder Guideline was employed for Kikumura's benefit. It worked to place a limit on the departure so that he would not "receive more time on a departure than he could have received had he been convicted of the crimes leading the judge to depart." *Id.* at 1112.

Kikumura's due process arguments have no merit. The relief requested in the Habeas Petition with respect to the due process claim is denied.

### C. *Other Claims*

Kikumura proffers several arguments to suggest his sentence violated the Guidelines and his constitutional rights. None of these arguments were raised on appeal and, therefore, are defaulted. *See Essig,* 10 F.3d at 979. The assertions of cause and prejudice offered by Kikumura to excuse his default are largely tailored to address his due process claims. It is not until the end of his cause and prejudice argument that Kikumura contends his "[d]ouble [j]eopardy claim ... and the remaining claims ... [w]ere unfounded until the Supreme Court acknowledged the authoritative value of the commentaries and policy statements in *Mistretta* [13] and *Stinson,* [14] and required courts to heed them in departure cases." Moving Brief at 55. Kikumura alternatively argues that, in the event the ground of novelty as a basis for default is rejected, ineffective assistance of counsel is further "cause" for his default on these claims. [15]

Kikumura further argues, in a footnote, the actual innocence doctrine applies to his "illegal consecutive sentencing scheme" and that he should therefore be relieved of the "cause" requirement. Kikumura argues "[h]e was not guilty of the uncharged crimes introduced into the grouping and structuring of counts and was therefore actually innocent of the improper factors that increased his punishment beyond ten years." Moving Brief at 56 & n. 48 (citing *Sawyer v. Whitley,* 505 U.S. 333, 339–40, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992); *United States v. Maybeck,* 23 F.3d 888 (4th Cir.1994)).

As will be discussed, Kikumura's sentence was not based upon uncharged crimes which were introduced in the grouping and structuring of counts, but upon a legally permissible upward departure that was based upon the finding of an intent to kill by clear and convincing evidence. Kikumura has not established cause or prejudice for failing to bring these arguments in earlier proceedings. In any event, the arguments raised with respect to Kikumura's sentence have no merit.

### a. *Double Jeopardy*

██ Kikumura argues the sentence was imposed in violation of the Double Jeopardy

---

**13.** *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

**14.** *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

**15.** Kikumura raised the argument of ineffective assistance of counsel as a ground for default on these claims in a footnote. *See* Moving Brief at 51 & n. 47. Kikumura did not further expand on the ineffective assistance of counsel argument.

Clause and in derogation of *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) and *Williams v. United States,* 503 U.S. 193, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). He contends the departure was unconstitutional because it transformed a concurrent sentence into a consecutive one as a result of factors that cannot be used under the Guidelines. Moving Brief at 35. Kikumura argues:

> Guideline principles must be followed when imposing multiple punishments even if a departure ensues. [Section] 3D structures sentences for multiple counts of conviction, and 5G1.2 determines whether concurrent or consecutive terms are imposed. Further, the Sentencing Commission prohibits courts from introducing uncharged crimes into these multiple punishments rules.
>
> In this case, the analogy to attempted murders (and the more than minimal planning enhancement) introduced uncharged crimes into the grouping and structuring of counts under 3D. Also the extreme conduct and endangerment of public safety departures rested on the uncharged specific intent to kill conduct that was extrapolated from count two. [citation omitted]. These uncharged crimes caused the sentences on the counts of conviction to run consecutively, a circumstance that was not authorized by the Guidelines....

Moving Brief at 39–40. Kikumura argues "the upward departure should be limited to the statutory maximum of the count which carries the highest statutory term in the indictment, which in this case is ten years [for the violation of Section 844(d) ]." *Id.* at 40.

■ In the instant case, the combined offense level was properly calculated. An upward departure was imposed based upon a finding of an intent to kill and the sentences were ordered to run consecutively to obtain the appropriate total punishment. Section 5G1.2(d) of the Guidelines provides,

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.

Section 5G1.2(d). Kikumura appears to argue the "total punishment" referenced in Section 5G1.2 cannot include any upward departures, but should be limited to ten years, the statutory maximum of Section 844(d), as determined by multiple count rules in Section 3D1.1–5. *See* Moving Brief at 40; Reply Brief at 14. Case law to the contrary, however, demonstrates total punishment for purposes of Section 5G does include upward departures. *United States v. Hui,* 83 F.3d 592, 593–94 (2d Cir.1996) (total punishment for § 5G1.2 purposes includes upward departure and district court has power to run sentences consecutively in order to implement upward departure.); *United States v. Griggs,* 47 F.3d 827, 831–32 (6th Cir.1995) ("[Section] 5G1.2 does not itself come into play until the court has determined a guideline range, and then chosen a specific sentence within or (where a departure occurs) outside the range."); *United States v. Hernandez Coplin,* 24 F.3d 312, n. 9 (1st Cir.) (" '[T]he total punishment' under U.S.S.G. § 5G1.2 is normally determined by the guideline range, see [Section 5G1.2(b) ], but where the sentencing court lawfully departs from the [G]uideline range, 'the total punishment' is the punishment specified as a result of that departure; and sentences then run consecutively 'to the extent necessary to provide a combined sentence equal to the total punishment.' *See id.* subsection (d)."), *cert. denied,* 513 U.S. 956, 115 S.Ct. 378, 130 L.Ed.2d 328 (1994).

Contrary to the argument of Kikumura, the analogy posed by the Circuit did not "introduce[ ] uncharged crimes into the grouping and structuring of counts under 3D." Moving Brief at 39. Rather the exercise sought to cap the upward departure by analogy to ensure Kikumura would not receive more time on a departure than he could have received had he been convicted of the crimes leading the court to depart. *Kikumura III,* 918 F.2d at 1112. The sentence does not violate the Double Jeopardy Clause.

b. *Separation of Powers and Due Process*

Kikumura argues "any sentence that is imposed as a result of an incorrect applica-

tion for the [G]uidelines necessarily violates the separation of powers between the legislative and judicial branches and the due process clause because the Court imposes a sentence in conflict with its legislative mandate." Moving Brief at 40. Because there was not an incorrect application of the Guidelines, there is no violation of the separation of powers or due process.

### 1. *Guideline Principles*

Kikumura argues the sentencing practices in this case violate the Sentencing Commission's policies against disparity in sentencing, count manipulation, the arbitrary casting of a single transaction into multiple counts to increase a sentence, prosecutorial abuse of its charging authority, and double counting. Moving Brief at 41. Kikumura argues: "No matter how unique the crime was the huge departure is reminiscent of real offense' sentencing and it threatens one of the main objectives that the Guidelines were founded on." *Id.* (citations omitted). Kikumura does not cite any specific violation of the Guidelines, but bases his argument on Guideline policies.

The Guidelines, however, explicitly provide for upward departures based on factors not adequately taken into account. The Circuit concluded an upward departure was legally permissible in this matter because "none of the offense [G]uidelines under which Kikumura was sentenced t[ook] into consideration [his] intent to kill." *Kikumura III*, 918 F.2d at 1109.

■■■ Kikumura appears to argue the prosecution manipulated the counts in the Indictment which allowed "the [G]overnment to unfairly exploit the number as opposed to the substance of the charges." Moving Brief at 43. No such manipulation occurred in this case. As discussed, Kikumura's sentence was based on a single combined offense level, from which the permissible upward departure was imposed.

■■■ Kikumura also argues the sentence was the result of double counting. Kikumura contends "aggravating factors embodied in one count of conviction cannot be used to enhance a sentence on other counts. ..."

[Because] attempted murder was used as a sentencing factor to depart under Section 844(d), it is double counting to reuse the same factor to increase the punishment on the other counts." Moving Brief at 43–44.

As stated, Kikumura was assigned a combined offense level. It was from that offense level that the upward departure was imposed. The upward departure was not duplicatively applied to each count. The sentence does not violate Guideline principles.

### 2. *Statutory Law*

■■■ Kikumura cites 18 U.S.C. §§ 3584(b) and 3553(a) as evidence "that Congress did not expect the [c]ourts to depart from the Guidelines to impose multiple sentences." Moving Brief at 44. Kikumura argues:

18 U.S.C. [§ ]3584(b), which instructs Courts on the imposition of concurrent and consecutive sentencing, refers to the sentencing factors in § 3553(a). The factors in § 3553(a) govern the imposition of sentencing and expressly require the Courts to consider the Guidelines and the policy statements adopted by the Sentencing Commission. *See* [18] U.S.C. §§ 3553(a)(4) and (5). However, when Congress drafted [§ ]3584(b) it did not mention [§ ]3553(b), the provision which authorizes departures from the Guidelines. This omission, especially in light of subdivision (a) from the same statute, evidences Congress' intent to have the Courts apply the Guidelines when imposing punishment for multiple counts of conviction.

Moving Brief at 44. Kikumura contends "Congress did not authorize the [c]ourts to impose consecutive sentences when departing from the Guideline's application in light of the exclusion of [Section] 3553(b) (and inclusion of [Section] 3553(a)) in [Section] 3584(b)." Reply Brief at 17.

A court has discretion to impose a consecutive or concurrent sentence. *See* 18 U.S.C. § 3584(a); *United States v. Nottingham*, 898 F.2d 390, 393 (3d Cir.1990). Section 3584(b) of Title 18 directs a sentencing court to consider factors outlined in 18 U.S.C. § 3553(a), such as the seriousness of the offense and the need for deterrence, when

imposing consecutive or concurrent sentences. *See* 18 U.S.C. § 3584(b). These factors were considered when Kikumura's sentence was imposed. *See, e.g., Kikumura II,* 706 F.Supp. at 340, 346.

The sentence did not violate Guideline policies for imposing punishment for multiple counts of a conviction. The Guidelines have special rules for grouping multiple counts in Chapter Three and obtaining a combined offense level. The Guidelines also authorize consecutive sentences to the extent necessary to permit the total Guideline punishment to be imposed. *See* § 5G1.2(d).

■ Kikumura cites 28 U.S.C. § 994(v), which ordered the Sentencing Commission to carry out "a policy limiting consecutive terms of imprisonment for ... an offense involving a specific prohibition encompassed within the general prohibition." Moving Brief at 44–45. Kikumura argues "attempted murder is a specific prohibition encompassed by the general prohibition of possession of explosives with felonious intent borne from [Section] 844(d). As such, attempted murder should not supersede in importance the emphasis placed on the general prohibition under [Section] 844(d), but rather the general prohibition should serve · as the framework for attempted murder." *Id.* at 45. Kikumura argues adherence to Section 994(v) would be achieved by limiting the departure to the ten year statutory maximum pursuant to Section 844(d).

Here, there was a single total punishment applied, based on the Guidelines and an authorized departure. The consecutive terms were applied for the purpose of covering the total punishment. The offenses which were run consecutively were not subsets of each other. Kikumura's sentence was not improper.

### D. *Newly Discovered Evidence*

■ Kikumura argues that "[n]ew evidence has come to light that directly challenges the 'intent to kill' finding, the primary basis for [his] lengthy sentence." Moving Brief at 26. Kikumura contends the allegations of Whitehurst reveal Thurman testified outside of his expertise and provided false and misleading testimony at the First Sentencing Hearing. *Id.* Kikumura requests an order pursuant to "Rules 6 and 7 applicable to [Section] 2255 for a deposition with [Whitehurst], and to supplement his pleadings." *Id.* at 27. In the alternative, Kikumura requests an evidentiary hearing. *Id.* at 35.

The allegations made by Whitehurst were investigated by the Department of Justice ("DOJ"). The results of the investigation were memorialized in the Report. *See* Report. The Report, though containing criticisms and a recommendation of reassignment of Thurman, *id.* at 4, found "no basis for the allegations that Thurman testified falsely or violated FBI policies in this case. In some areas, Thurman's testimony contain[ed] ambiguities or minor inaccuracies." *Id.* at 244.[16]

The allegations of Whitehurst do not undermine the confidence in the central factual conclusion that the bombs were designed and intended to kill people. Even if proven, the allegations do not constitute "misinformation of constitutional magnitude" which was specifically relied upon in imposing the sentence. *See United States v. Matthews,* 773 F.2d 48, 51 (3d Cir.1985); *see also United States v. Spiropoulos,* 976 F.2d 155, 163 (3d Cir.1992).

Kikumura cites the Circuit's opinion which he claims "relied heavily" on Thurman's opinion to uphold the intent to kill finding. Moving Brief at 28. Kikumura also cites the Circuit's reliance on Thurman's testimony to address the argument on appeal that the presence of shrapnel in the bombs did not prove an intent to kill finding over an intent

---

16. The Report contained strong criticisms of Whitehurst, as well:

> We concluded that [Whitehurst] cannot effectively function within the Laboratory and suggested that the FBI consider what role, if any, he can usefully serve in other components of the FBI. In making that determination, the FBI and the [DOJ] must weigh the significant contribution he had made by raising issues that needed to be addressed within the Laboratory against (1) the harm he has caused to innocent persons by making many inflammatory but unsubstantiated allegations, and (2) the doubts that exist about whether he has the requisite common sense and judgment to serve as a forensic examiner.

Report at 4.

to damage property. *Id.* Whatever the Circuit relied on to uphold the intent to kill finding does not alter what I relied on to make the intent to kill finding and the finding that Kikumura "will commit similar offenses in the future given the opportunity to do so." *Kikumura II,* 706 F.Supp. at 346.[17]

I did not rely on the testimony of Thurman. Rather, the finding was based on a wide spectrum of information which demonstrated by clear and convincing evidence Kikumura intended to kill and maim. That evidence, as outlined in-the facts,[18] included the arrest of Kikumura in the Netherlands for possession of explosive materials, his participation at the terrorist training in the Bekaa Valley Camp, his illegal entry into the United States, his 7000 mile journey throughout the United States to acquire the materials needed to assemble the bombs, the discovery in the Kikumura Vehicle of three home-made bombs in addition to two cans of aluminum powder, ammonium nitrate and mercury—an ingredient that could have been used to create a "booby trap" switch, the large amount of lead shot packed in the bombs which "was clearly intended to produce 'personal injuries,'" *see Kikumura II,* 706 F.Supp. at 338, the simultaneous attack in Naples, Italy and concomitant anniversary of the raid by the United States on Libya.

The alleged newly discovered evidence does not affect the strength of the finding of an intent to kill, which was based on a clear and convincing foundation of evidence. Of that evidence, the Thurman testimony comprised only a minor part. The finding of the intent to kill is not disturbed by the allegations of Whitehurst or the allegations in the Habeas Petition.

a. *Thurman's Background*

■ Kikumura argues the Report indicates Thurman did not have a scientific background and was not "versed in chemistry or electronics, areas critical to the understanding-of-the smokeless·powder and fusing components of the bombs." Moving Brief at 28 (citing Report at 248–252). Thurman was removed from the FBI Laboratory due to his lack of scientific background and the DOJ is re-evaluating whether he is qualified to supervise. *Id.* (citing Report at 4).

At sentencing, the Government questioned Thurman to demonstrate his qualifications with respect to rendering an opinion on the construction, identification, capability and operation of the explosive materials, including the three bombs discovered in the Kikumura Vehicle. Transcript of Proceedings, dated 7 February 1989 ("7 February 1989 Tr."), 91. The testimony revealed Thurman was employed in the Explosives Unit of the FBI Laboratory in Washington, D.C. *Id.* at 92.

Thurman testified as to his formal education and specialized experience which assisted him in forming his opinions in the case. Thurman graduated from George Washington University with a Master's Degree in forensic science. Following college, he served eight years as an Army officer, during which time he received training in explosives, military ordinance and ammunition. *Id.*

Thurman graduated from the United States Navel Explosive Ordinance Disposal, which is the school that trains all military bomb technicians in explosives, improvised explosive devices and the methods utilized to render explosive items safe. Thereafter, Thurman served five years as a detachment commander in the military as an explosive ordinance disposal officer. *Id.*

Thurman then was appointed a special agent with the FBI, where he initially worked as a criminal investigator, specializ-

---

17. The original sentence of thirty years was intended to ensure Kikumura would not be given a· third opportunity to attempt to bomb or commit other terrorist acts. This was meant to be accomplished through the element of specific deterrence. *See* 18 U.S.C. § 3553(a) (in determining particular sentence to be imposed, court shall consider the need "to protect the public from future crimes of the defendant...."), U.S.S.G. 4A Intro. Commentary (one of the purposes of sentencing is "[t]o protect the public from further crimes of the particular defendant...."). At the completion of the original thirty year term, Kikumura would have been into his sixties. Hopefully, the ·deterrent of time would have curbed his terrorist inclinations. For these reasons and others, stated here and in *Kikumura II,* I would, if given the opportunity, re-sentence Kikumura to the original thirty year term.

18. *See* Facts section, page 567, *infra.*

ing in bomb investigations. *Id.* at 93. Thurman proceeded to the FBI Laboratory where he trained for more than one year with other forensic examiners in the explosive unit. *Id.* at 93. After the completion of training, Thurman was certified as a hazardous device and explosive device specialist with the FBI. *Id.* at 94. Thurman was involved in "hundreds" of investigations involving explosive devices and improvised explosive devices. *Id.* Thurman has been certified as an expert in explosives and explosive materials in other courts around the country. *Id.* at 95.

Kikumura had the opportunity to voir dire Thurman on his expertise. *Id.* at 95–6. Thurman testified he was not the agent who disassembled or made the bombs discovered in the Kikumura Vehicle safe. Thurman testified, at the time he first viewed the bombs, they had been disassembled. Thurman was not questioned on his scientific background, or alleged lack thereof. After voir dire, Kikumura made no objection to the qualifications of Thurman to testify. *Id.* at 97–98.

The allegations are not sufficient to call into doubt the qualifications of Thurman. "[I]nsistence on a certain kind of degree or background is inconsistent with [Third Circuit] jurisprudence in this area." *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 781 (3d Cir.1996) (citation omitted). "The language of Rule 702 [of the Federal Rules of Evidence] and the accompanying advisory notes make it clear that various kinds of 'knowledge[,] skill, experience, training or education,' ... qualify an expert as such." *Id.* (citation omitted).

Thurman testified at a sentencing hearing, where the Rules of Evidence do not apply and where the risk of misleading or confusing a jury is absent. Given the liberal rule on the various skills that qualify an expert at trial, and in light of the experience and training Thurman did receive, Thurman's testimony is not undermined by the allegations of Thurman's background by Whitehurst or Kikumura in the Habeas Petition.

#### b. *Thurman did not perform the critical examinations*

■ Kikumura argues "Thurman did not do the critical examinations that led to the conclusion that smokeless powders [19] comprised the main charge of the bombs and he perjured himself and told that [c]ourt that he did." Moving Brief at 29. Kikumura argues Thurman had no chemistry training and "was not even qualified to do the tests." *Id.*

The Report addressed whether Thurman testified outside of his expertise. The Report concluded that Thurman did not lie on the stand when he answered, "I did," to the question of whether he conducted a more thorough and scientific examination of the evidence. Report at 249. Thurman did conduct further examinations, although he enlisted others to work on the case as auxiliary examiners. *Id.* When asked for his opinion about the composition of the bombs, Thurman correctly restated the conclusions set forth in the Laboratory report ("Lab Report"), which reflected the analytical work of chemist Lynn Laswell ("Laswell"). *Id.* On cross examination, Thurman testified that he "helped" prepare the Lab Report. *Id.;* 7 February 1989 Tr. at 132.

The Report recognized Thurman could have employed the third person, rather than the first person, to avoid any ambiguity concerning his testimony. His failure to do so, however, does not undermine his testimony, especially in light of the fact the Lab Report was introduced as an exhibit. Report at 249.

#### c. *Testimony regarding Lead Shot*

■ Kikumura argues "Thurman was incorrect when he stated that the lead shot would be released in all directions. Rather it would be ejected in one direction from the top of the bombs." Moving Brief at 29. Kikumura argues this is material because "the Circuit's belief that lead shot would 'disperse in all directions,' which it took directly from Thurman's testimony to find intent to kill, was erroneous, and its finding on this score is shaken." *Id.*

---

**19.** There appears to have been no contention that the powder Thurman testified about was an explosive. Otherwise, Kikumura would not have stipulated the devices were bombs and were intended to, at least, cause property damage.

Thurman testified on direct examination that the lead shrapnel would "spread around the room." *See* 7 February 1989 Tr. at 118. On redirect he testified the shrapnel would be released "in all directions." *Id.* at 150. When asked to compare the blast to a Claymore mine, Thurman stated the bombs had less "directional capacity," *id.* at 159, and would radiate in a "360 degree arc." *Id.* at 159–60.

The Report characterized Thurman's testimony with respect to the directional capacity of the lead shot to be one of four "minor inaccuracies" in his testimony. Report at 255. The Report stated:

> The bombs were described at the [First Sentencing Hearing] as having lead shot at the top of each cylinder. As described, they would release shot in a manner similar to a shotgun shell. Thurman's testimony was incorrect or at least ambiguous insofar as it suggested that shot would be released in all directions from the bombs. If he intended to say that the bombs would release shot in a forward direction in a 360–degree circular pattern he could have done so more clearly.

Report at 255–56.

The intent to kill at the First Sentencing Hearing was not based on any alleged incorrect testimony. It was not found that the shrapnel would radiate in all directions. Rather, it was found the shrapnel would spray "in a wide pattern." *Kikumura II,* 706 F.Supp. at 339. The effect of the bombs was compared to that "as an immense shotgun blast" or the "detonation of a Claymore mine." *Id.*

In any event, it is the existence of the lead shot in the bombs, not the directional capacity of the lead shot in an explosion, which lead to the finding of the intent to kill. There is no dispute the bombs were packed with lead shot and that lead shot "has no utility in an explosive device intended for use in demolition or for causing damage to property—it simply wastes space which would otherwise be available in the casing for more explosives." *Kikumura II,* 706 F.Supp. at 339. The fact that the direction of the lead shot in the explosion was incorrectly or ambiguously described by Thurman does not undermine the intent to kill finding.

#### d. *Ammonium Nitrate*

██ Kikumura argues "Thurman created an unreasonable inference that [Kikumura] intended to make a large and powerful ammonium nitrate bomb." Moving Brief at 29 (citing Report at 250–51). Kikumura argues four points on this issue. First, Thurman failed to report that Terry Rudolph ("Rudolph"), the agent from the Material Analysis Unit in the FBI, was the one who identified traces, three prills, of ammonium nitrate. *Id.* Second, Thurman overstated Rudolph's finding that the prills were of agricultural origin and that, therefore, it was "'likely' whoever put them in [the Kikumura Vehicle] had a larger quantity." *Id.* at 30 (citing 7 February 1989 Tr. at 149–50). Rudolph's dictation, however, indicated this was "probably" the case and the Office of the Inspector General concluded in the Report that this was "possible," not likely. *Id.* Third, Thurman implied Kikumura intended to make a mercury fulminate detonator and "gave the impression that mercury fulminate could have been made with rubbing alcohol found in [the Kikumura Vehicle]." *Id.* (citing Report at 253). Fourth, Thurman falsely testified that mercury fulminate was commonly used to manufacture blasting caps, which is not true. *Id.* (citing Report at 255).

Kikumura's emphasis on the ammonium nitrate bomb is unwarranted. The reference to the ammonium nitrate in the decision to upward depart was not central to the finding of an intent to kill. This item, among others, was recovered from the Kikumura Vehicle and discussed only to demonstrate the danger Kikumura presented. *Kikumura II,* 706 F.Supp. at 338. It was recognized the items could be used to "create an extremely high explosive." *Id.* The upward departure, however, was based upon the destructive nature of the bombs that were assembled.

The Report investigated these allegations. It concluded Rudolph's conclusion that the prills were agricultural grade ammonium nitrate was chemically correct, although his underlying notes could no longer be found to assess his work. Report at 251. The Report

confirmed agricultural grade ammonium nitrate is usually sold in fifty pound bags. *Id.*

The testimony as to whether the possessor of agricultural grade ammonium nitrate likely (Thurman's testimony), probably (Rudolph's dictation) or possibly (Report conclusion) had a larger quantity is insignificant. Putting aside the fact the existence of the ammonium nitrate was of little consequence to the findings made at sentencing, it is a common-sense inference that a person who possesses a trace of fertilizer grade ammonium nitrate at one time possessed more.[20] Three prills have no use. This inference is especially persuasive in light of the fact of Kikumura's history, his experience with explosives, and other circumstances of this case.

On cross-examination, Thurman misspoke as he described the process for making mercury fulminate. Thurman stated nitric acid would be added to mercury fulminate as part of the chemical process. He "meant to say that nitric acid would be added to mercury, and after that reaction ceased, alcohol would be added to the mixture to produce mercury fulminate." Report at 253. This misstatement did not confuse or mislead.

As to the alcohol, Thurman answered on cross examination there was "common variety rubbing alcohol" found in the Kikumura Vehicle. 7 February 1989 Tr. at 125. Whitehurst suggests Thurman "misled the jury" because mercury fulminate could not be made from this type of alcohol. Report at 253. Putting aside the fact Thurman testified at a sentencing hearing where there was no potential to mislead the jury, the inquiries posed to Thurman were asked on cross examination. Thurman merely answered the questions posed. 7 February 1989 Tr. at 125. Trial Counsel did not ask a follow-up question on the type of alcohol in the Kiku-

mura Vehicle. This was not a significant issue. The presence or absence of alcohol, much more the type of alcohol, was not a factor in the upward departure determination. *See Kikumura II*, 706 F.Supp. at 331.

Thurman testified mercury fulminate is commonly used to manufacture blasting caps. Report 255. The Report concluded, "[a]lthough mercury fulminate was once so used, we question whether by early 1989 it was still commonly used in commercially manufactured blasting caps in North America. . . . [T]his is a relatively minor point, particularly because Thurman accurately stated that mercury fulminate can be used in a blasting cap for high explosives." *Id.* Whether mercury fulminate could be used for the manufacture of blasting caps was not crucial to the basis for the upward departure.

The remaining allegations of Whitehurst raised by Kikumura in the Habeas Petition also do not affect the upward departure and were not material to the findings upon which the upward departure was made.[21] It is inconsequential to the upward departure whether "Whitehurst rejects Thurman's claim that he was unable to reconstruct the bombs out of fear for his safety." Moving Brief at 30–31. It is also not material Thurman "may have erroneously suggested that the bomb would create two fireballs, when it would likely create one" or that Thurman's capacity to state Kikumura had a "very high level of expertise" based upon the electrical make-up of the fuzing system has been challenged. *Id.*

■ None of these issues demonstrate Kikumura is entitled to relief or that he is entitled to an opportunity to depose Whitehurst. The allegations, even if true, do not undermine the factual determinations made in imposing the sentence Kikumura received.

---

**20.** Whitehurst apparently objected to Thurman's testimony because "ammonium nitrate could be picked up from a lawn or an agricultural community and transported in Kikumura's shoes." Report at 253–54. The Report concluded "[b]ecause the prills were found inside a paper bag, Thurman was not obligated to volunteer that prills can be picked up in a person's shoes." *Id.*

**21.** Kikumura filed the 11 July 1997 Motion seeking to supplement his Moving Brief with ad-

ditional information concerning the Whitehurst allegations, which was obtained from the Government on 30 June 1997. The 11 July 1997 Motion was denied. The testimony of Thurman did not comprise a significant basis for the factual findings leading to the departure. For that reason, any additional issues raised in the 11 July 1997 Motion would not undermine the factual findings upon which the departure was based.

Kikumura argues because he is receiving only the "[G]overnment's summarized version of Whitehurst's allegations and its conclusions about them," he is disadvantaged. Moving Brief at 32. Kikumura received the Report as well as the documents underlying the Report for his review. Opposition Brief at 46. Whitehurst had no connection to this case. He was not a fact witness. His allegations are based on his review of the transcript of the hearing in this matter. That Whitehurst "could not review a draft of the Report with counsel and therefore could not fairly comment on factual inaccuracies and errors prior to publication" is not relevant. Moving Brief at 32.

Kikumura argues "[i]t would be wrong to summarily deny a deposition and further proceedings based upon the ... Report or a claim by the [G]overnment that Whitehurst does not (or cannot) produce enough evidence to ultimately warrant relief." Moving Brief at 32. In these circumstances, the denial of a deposition of Whitehurst, the right to supplement the pleadings and an evidentiary hearing is appropriate. The testimony of Thurman, although mentioned in passing, was not relied upon at the First Sentencing Hearing to impose the sentence upon Kikumura. The newly discovered evidence is not material. The allegations of Whitehurst, even if proven, will not change the intent to kill finding and does not rise to the level of a violation warranting Section 2255 relief.[22]

*Conclusion*

For the reasons above the Petition is denied; there is no probable cause for appeal.

---

**22.** The non-dispositive testimony of Thurman cause the remaining arguments of Kikumura to be rejected as well. Whether "the record raises the possibility ... the prosecutor knew about Thurman's perjury, but failed to alert the Court"

and whether Kikumura had a "right to confront the [examiners who did the underlying work] at the [S]entencing [R]earing" are immaterial to the basis of the departure. Moving Brief at 33–34.